UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TEOKA WILLIAMS,

    Plaintiff,

v.

BEAUMONT HEALTH SYSTEM,

    Defendant.

_____/

Case No. 18-12522
District Judge Victoria A. Roberts
Magistrate Judge Mona K. Majzoub

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF No. 30]

### I. INTRODUCTION

Teoka Williams—formerly a nurse at Beaumont's Dearborn hospital—reported to her supervisor, Crystal Kopriva, that she overheard her patient tell someone on the phone, "I do not want that black bitch taking care of me." Another nurse overheard the remark. Kopriva spoke to the patient. Williams says she overheard the patient make a similar remark to Kopriva. Within moments, Kopriva reassigned Williams and replaced her with a white nurse.

Williams says that, through this reassignment, Beaumont Health System ("Beaumont") engaged in race discrimination in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and Michigan's Elliott-Larsen Civil Rights Act.

Beaumont seeks summary judgment; it says Williams fails to present sufficient evidence of both intentional discrimination and damages. Oral argument was heard on August 14, 2019.

1

On this record, a reasonable jury could conclude that the "black bitch" comments, of which Kopriva was aware, constitute direct evidence of discrimination; a jury could find Kopriva's knowledge of the statements was contemporaneous with Williams' reassignment or causally related to the adverse action decision making process.

The Court **DENIES** summary judgment.

II.     FACTS

Williams was employed by Beaumont as a registered nurse. On November 1, 2017, Williams began her shift at 11:30 pm; she was responsible for caring for six patients during her shift, including the "Patient."

At approximately 4:48 am, Williams responded to the Patient's request for assistance. According to Williams, the Patient needed help going to the bathroom. Williams says the Patient lost her footing as she rose from her bed. Williams says that she "gently but quickly grabbed the Patient to prevent her from falling"; the Patient allegedly then told Williams not to touch her and requested a new nurse. The Patient also allegedly told Williams to get her supervisor, Crystal Kopriva.

Williams says she left the Patient's room but overheard a phone call that the Patient began while she was still in the room. Williams says that, as she stood outside the Patient's room, she heard the Patient tell someone that she did not want that "black bitch" taking care of her. Williams says her co-worker, Shakina Kalonda, also heard the Patient's "black bitch" comment. After overhearing the Patient's statement, Williams went to find Kopriva; Williams told Kopriva about the "black bitch" comment. Kopriva admits as much.

2

Williams says that Kopriva then spoke to the Patient; Williams says that—standing outside the Patient's room—she heard the Patient tell Kopriva that she did not want a black nurse. Williams says Shakina Kalonda heard this statement as well. Once Kopriva finished with the Patient, she and Williams had a conversation; Williams says that Kopriva told her that the Patient "didn't say anything bad about [her]." Nonetheless, Kopriva decided to remove Williams from caring for the Patient, assigning Olivia Moylan, a white woman, to the Patient instead. Moylan and Kopriva were then responsible for administering any medication that the Patient needed. Williams says Kopriva chose Moylan over another black nurse working on the floor that evening.

Williams says her shift ended at 8:00 am on the morning of November 2; but she did not get off work until 8:30 am. Williams ran into Kelley Fildew, a Human Resources Representative, when leaving work; Williams told Fildew what happened with the Patient. Fildew told Williams to email her the relevant information. Williams emailed Fildew on November 3, stating, in relevant part, that the Patient said she didn't want a "black bitch" taking care of her, and that the Patient never gave Kopriva a reason "why she no-longer[sic] wanted me as her nurse."

After receiving Williams' email, Fildew contacted the Clinical Manager responsible for the Patient's unit, Toni Ward, and asked her to investigate the incident. Beaumont says that Ward talked to Kopriva twice and talked to Olivia Moylan. Beaumont also says that Ward met with the Patient, who told Ward that "she felt [Williams] had been a little rough with her when she was trying to get out of bed to go to the bathroom"; Beaumont says that "the Patient said nothing to Ward about having an issue with Plaintiff's race." However, Williams contends that the Patient was never asked whether she made a

3

request based on race, or whether she referred to Williams as a "black bitch." [ECF No. 31, PageID.566].

Williams and Fildew had already scheduled a meeting for reasons unrelated to the alleged race discrimination; Fildew informed Williams that they would discuss the alleged discrimination at that previously scheduled meeting.

Williams met with Human Resources on November 8, 2017. Williams says that she was told "patients have the right to refuse care for whatever reason"; she says she was also told that "a patient requesting care based on race is no different from a Middle Eastern female patient requesting not to have a male as her nurse." To that point, Williams alleges that "Fildew admitted nobody said patient requests based on race are not honored by Defendant." It is undisputed that Beaumont does not have a policy on what to do when a patient requests care based on the race of the caregiver. [ECF No. 31-6, PageID.606].

Additionally, Fildew's meeting notes—dated November 8, 2017—explicitly state that "Teoka stated that the patient in 881-bed #2 stated she didn't want her to be her nurse because she was black . . . Teoka stated as she left the room the patient stated she 'didn't want a Black Bitch to be my RN.'" [ECF No. 31-11, PageID.631].

Notably, Williams created a series of "progress notes" documenting her relevant interactions with the Patient. Williams' first relevant progress note was entered at 4:48 am on November 2; she noted, in pertinent part, that she attempted to help the Patient get to the bathroom and that the Patient yelled "I want a different nurse." Williams also

4

noted that she "requested charge nurse to speak with the pt. Per charge nurse, pt did not give a reason why she no longer wanted assigned nurse to continue caring for her."

Williams made another entry at 5:02 am. Here she said that she was "now removed from caring for patient by assistant manager. Advised not to enter room anymore."

Finally, at 5:35 am, Williams entered a note—apparently documenting an incident that occurred at 5:10 am—stating that "Pt can be heard from the hallway, 'I do not want that black bitch taking care of me.'"

Beaumont says that Williams' progress notes—when examined alongside her oral timeline of events—demonstrate an inconsistency that is insurmountable; it says she cannot provide reliable, consistent evidence that Beaumont had discriminatory intent when it reassigned her. Responding, Williams says that although the times of the progress notes are a "little off," they are an accurate representation of what happened that night; she says that her evidence is sufficient to create a genuine fact issue for the jury on Beaumont's discriminatory intent.

## III. STANDARD OF REVIEW

Summary Judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden to demonstrate the basis for its motion and to identify portions of the record which show an absence of a genuine issue of fact. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). Once that burden is met, the non-moving party must set forth specific facts that present a "genuine issue for trial." *Id*. The existence of a mere scintilla

5

of evidence to support a plaintiff's position will not suffice; there must be evidence on which the jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Parties must support assertions of fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

## IV. ANALYSIS

### A. Williams Proffers Direct Evidence and Creates a Genuine Fact Issue on Intent

Beaumont argues the only evidence of discrimination is the Patient's statements, which cannot be imputed to Beaumont. While Beaumont is correct, its focus is misplaced. The Patient's statements need not even be true. What is true and important is that Williams' supervisor, Kopriva, was informed of the "black bitch" statement by Williams and reassigned Williams within moments.

42 U.S.C. § 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (citing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867-68 (6th Cir. 2001)). "The statute's protection extends to 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* (quoting 42 U.S.C. § 1981(b)). "Section 1981 liability must be founded on purposeful discrimination." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (citing

*Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982)). "[P]roof of discriminatory intent is essential" to prove a violation of the statute. *Id.* (citing *Gen. Bldg. Contractors*, 458 U.S. at 388.).

Michigan's Elliott-Larsen Civil Rights Act prohibits "discriminat[ion] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race." Mich. Comp. Laws § 37.2202(1)(a).

Finally, Title VII of the Civil Rights Act of 1964 prohibits, in pertinent part, race discrimination in employment. *See* 42 U.S.C. § 2000e-2(a)(1). Importantly, the Sixth Circuit instructed that "[w]e review claims of alleged race discrimination brought under § 1981 and the [ELCRA] under the same standards as claims for race discrimination brought under Title VII." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

A plaintiff alleging race discrimination under Section 1981 must plead and prove that: "(1) [s]he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against h[er] on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini*, 440 F.3d at 358. The defendant's intent can be established by either direct or circumstantial evidence. *Id.* (citing *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985)).

During the hearing, Williams' counsel argued that this is a direct evidence case. "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 359.

7

Occasionally, the "smoking gun" case presents itself: an employer makes a blatant remark and racial animus is clear. Most often, plaintiffs are not presented such express gifts as they fight employment discrimination. And, decisionmakers seldom admit that they based decisions on race.

But—contrary to Beaumont's assertions—express classifications are not the only form of direct evidence of an intention to discriminate.

Other direct evidence of discrimination includes "any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but *a* basis—for the adverse employment action." *Fabela v. Socorro Independent School Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). "[I]n deciding which evidentiary framework applies, the district court must ask whether the direct evidence, *truly* standing alone, is sufficient to support the conclusion that a nexus exists between the protected activity and the adverse employment action." *Id.* at 416.

Courts considering direct evidence must ultimately decide "whether a reasonable jury could believe that a causal connection existed between [race and the adverse employment action], assuming the jury believes—as here we must assume they would" the plaintiff's proffered direct evidence of intentional discrimination. *Id.* at 417.

Williams testifies concerning the information she provided to Kopriva just before Williams' reassignment. Kopriva knew that the Patient had called Williams a "black bitch"; the Patient also allegedly told Kopriva that she did not want a black nurse. A reasonable jury could find that these nearly contemporaneous events were directly related to Kopriva's decision-making process and is "evidence which in and of itself

8

suggests" that someone with managerial authority was "animated . . . by an illegal criterion." See Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). That is, considering Kopriva reassigned Williams—a black nurse—just moments after being told (by both Williams and the Patient) that the Patient did not want a black nurse, a reasonable jury could conclude that "unlawful discrimination" (i.e., reassigning Williams because of her race) "was at least a motivating factor in the employer's actions." See Amini, 440 F.3d at 359 (citation omitted). Also, Beaumont provided no guidance by way of a policy for staff to consult when patients expressed race-based staff preferences.

Further, Kopriva testified that her asserted justification—that the Patient said she did not like Williams' attitude—was not a legitimate reason to reassign Williams. [ECF No. 31-5, PageID.593]. "[R]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." Venters, 123 F.3d at 973.

Williams proffers direct evidence sufficient to raise a genuine issue of material fact regarding Beaumont's intent.

### B. A Reasonable Jury Could Find That Williams Suffered an Adverse Employment Action

Beaumont says Williams' claims fail because she cannot show that she suffered a "materially adverse employment action" as required by law; it says that any alleged adverse employment action was merely temporary or *de minimis*. Williams contends that a race-based employment assignment is unlawful, no matter how brief.

The Court finds that Williams' evidence is sufficient to show that she suffered an adverse employment action.

Notably, courts have found that an employer's race-based assignment may, in and of itself, constitute a materially adverse employment action. *See Patterson v. UPMC South Hills Health System, L.P.*, No. 03-89, 2005 WL 6720844, at *9 (W.D. Penn. May 15, 2015) (". . . [I]t is clear that, even in the absence of a monetary loss, job assignments based on race constitute adverse employment actions because such assignments affect the terms and conditions of employment."); *see also Crane v. Mary Free Bed Rehab. Hosp.*, No. 1:13-cv-1292, 2015 WL 10791897, at *6 (W.D. Mich. Mar. 13, 2015), *aff'd*, 634 F.App'x 518 (6th Cir. 2015) (acknowledging that "an adverse employment action may be based on the employer's race-based assignment of duties even without a change in pay, benefits, prestige, or responsibilities.").

Additionally, courts instruct that even a temporary or brief abridgement of a plaintiff's Section 1981 rights is actionable:

> Section 1981 violations need not be extended or unmitigated to qualify the plaintiff for damages. Although the length or nature of the violation may affect the plaintiff's award, the fact that an act of contractual discrimination was short or *de minimis* does not make it any less a violation. Indeed, "[c]ivil rights are founded not on a relativist calculus of discriminatory behavior but on the principle that deprivations of rights resulting from racial animus are unlawful."

*McCrary v. Oakwood Healthcare, Inc.*, 170 F. Supp. 3d 981, 989 (E.D. Mich. 2016) (quoting *Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 485-86 (D.Md. 1999)).

Notwithstanding, Beaumont cites to *Crane* to support its assertion that any alleged adverse action suffered by Williams was temporary or *de minimis* and, thus, not actionable. Specifically, Beaumont maintains that it only reassigned Williams for the last two and a half hours of her shift, and she suffered no change in pay, benefits, or job status due to the reassignment.

While acknowledging that race-based employment assignments are inherently adverse, the *Crane* court held that the plaintiff's race-based reassignment was *de minimis* because she had no direct care responsibility for the patient in question. *See Crane*, 2015 WL 10791897, at *6 (". . . Defendant's argument that the employment action here was *de minimis* and merely temporary is persuasive. It is undisputed that Plaintiff worked only two shifts while this patient was in the hospital, and she had no specific assigned responsibility to care for the patient because she was a supervisor.").

This Court distinguishes Williams' situation from that presented in *Crane*; Williams was assigned to provide care for the patient and was allegedly reassigned to accommodate the Patient's race-based preference. This reassignment—if based on Williams' race—constitutes an impermissible alteration of her responsibilities and the terms and conditions of her employment that is more than temporary or *de minimis*.

A reasonable jury could find that this incident had more than an insignificant impact on the terms and conditions of Williams' employment.

### C. The Court Will Not Discredit Williams' Testimony on Summary Judgment

Beaumont contends that Williams' testimony regarding the Patient's statements is so "unreliable" and "inconsistent" that she fails to create a genuine fact issue; it says that

no reasonable jury could find her testimony credible, meaning that the Court should disregard it on summary judgment. The Court declines to follow Beaumont's suggestion.

The Sixth Circuit instructed that "in rare cases, testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it." *Hanson v. Madison Co. Det. Ctr.*, 736 F.App'x. 521, 537 (6th Cir. 2018). "However, 'proof that a party . . . has made prior inconsistent statements is not a rare event in our courts. Juries are regularly called upon to consider evidence of that sort, and we all know that prior inconsistency does not inexorably lead to defeat." *Id*.

Similarly, in *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011), the Second Circuit noted that "if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete." The Second Circuit asserted that "in certain extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim.'" *Id*.

Williams' testimony does not blatantly contradict itself, nor is it "so contradictory that doubt is cast upon its plausibility." Beaumont says that Williams' testimony "as to what the Patient allegedly said over the phone and to Kopriva is unreliable, inconsistent, and does not create a genuine issue of fact." Specifically, Beaumont argues that "Plaintiff cannot recall with any consistency what she overheard the Patient say on the telephone," and "Plaintiff testified to at least nine versions of what the Patient allegedly told Kopriva."

While Williams' deposition answers vary slightly in terms of the Patient's alleged exact words, her testimony is generally consistent: the Patient told someone over the phone that she did not want that "black bitch" taking care of her, and told Kopriva that she did not want a black nurse. Further, Shakina Kalonda corroborates Williams' testimony; working with Williams on the evening in question, Kalonda said that she heard the Patient tell Kopriva that she "didn't want that black lady taking care of her."

Beaumont also points to the fact that Williams previously said that the Patient did not give Kopriva a reason for wanting a change; however, Williams maintains that she meant a "legitimate reason," and was very upset in the aftermath of the incident. Given Williams' explanation, the general consistency of her testimony, and Kalonda's corroboration, a reasonable jury could credit Williams' testimony.

The same reasoning also applies to Beaumont's argument that Williams' testimony should be discredited because she failed to document what the Patient allegedly said to Kopriva. Beaumont points to three things: Williams' progress notes, her email to Kelley Fildew, and her complaint. It is true that Williams did not document what the Patient allegedly said to Kopriva in her progress notes. And, in her email to Fildew, she said that the Patient did not give Kopriva a reason why she wanted a new nurse. Finally, in her complaint, Williams alleges that "Crystal talked to the Patient who told her she did not want Plaintiff caring for her."

None of these documents blatantly contradicts Williams' deposition testimony, particularly given her explanation that she was upset and meant the Patient did not give a legitimate reason. Most importantly, Kopriva herself acknowledges that Williams came

to her only moments after overhearing the Patient and told her of the black bitch statement.

Williams' testimony is consistent enough to allow a jury to determine its veracity. The Court will not discredit it and grant Beaumont summary judgment.

### D. Williams' Testimony is Admissible Nonhearsay

Finally, Beaumont argues that the Patient's statements are inadmissible hearsay; it contends that Williams is offering them to prove the truth of the matter asserted in the statements—that the Patient did not want a "black bitch" taking care of her. Williams documented the Patient's "black bitch" statement in her progress notes; she says both that statement and the Patient's alleged statement to Kopriva are admissible to show their effect on Kopriva.

Out of court statements offered to show their effect on the listener, rather than to prove the facts asserted in the statements, are not hearsay under the Federal Rules of Evidence. *See Moore v. City of Memphis*, 853 F.3d 866, 871 (6th Cir. 2017) ("But the defendants did not offer those statements for the truth of the matter asserted—that is, to show that Moore actually threatened Lynch and the officers. *See* Fed. R. Evid. 801(c). Instead, the statements were relevant for their effect on the listener—namely, that they made the officers believe that Moore had threatened their safety. *See United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015). The statements were therefore admissible.").

Williams' testimony regarding the Patient's statements is ultimately relevant to show how Kopriva reacted to those statements; rather than attempting to prove that the Patient did not want a black nurse, Williams will testify to show what Kopriva knew

before she reassigned Williams. Williams seeks to prove that Kopriva reassigned her to accommodate the Patient's racial preference.

Williams' testimony is admissible.

## V. CONCLUSION

This case is about what Kopriva and Beaumont believed—not that the Patient's statements should not be imputed to Beaumont.

Beaumont adamantly denies that Williams' race had anything to do with the decision to reassign her. It believes this case rises and falls on the fact that Williams has not come forward with direct evidence that Kopriva explicitly expressed a racial motivation for changing the Patient's nursing assignment.

But the law does not demand such stringency: such a requirement "would cripple enforcement of the discrimination laws." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999).

The evidence need not be as obvious as Beaumont urges in order for the Court to find Williams establishes a prima facie case of intentional discrimination. Even without a direct admission or express policy, a plaintiff may prove intentional discrimination with other forms of direct evidence demonstrating that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973), the Supreme Court asserted that Title VII "tolerates no racial discrimination, subtle or otherwise." This lack

of tolerance not only prohibits outright expressions of discriminatory intent, but also provides some redress when unthinking or unconscious bias infects employer decision-making.

Although different in some respects, there is a body of cases where courts hold that there is a factual dispute of race discrimination where an employer excludes an employee based on a customer's or patient's racial preference. *See Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908 (7th Cir. 2010); *see also Ferrill v. Parker Grp., Inc.*, 168 F.3d 468 (11th Cir. 1999); *see also Patterson v. UPMC South Hills Health System Home Health, L.P.*, No. 03-89, 2005 WL 6720844 (W.D. Penn. May 15, 2015); *see also McCrary v. Oakwood Healthcare, Inc.*, 170 F. Supp. 3d 981 (E.D. Mich. 2016).

Any intentional use of race—whether for malicious or benign motives—is subject to careful judicial scrutiny. *See City of Richmond c. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226 (1995). Accordingly, the record need not contain evidence of "bad faith, ill will or any evil motive on the part of the [employer]." *Williams v. City of Dothan, Ala.*, 745 F.2d 1406, 1414 (11th Cir. 1984).

Viewing the evidence in the light most favorable to Williams: she provides sufficient proof—to get to a jury—that bias infected Kopriva's decision to reassign her.

Beaumont's motion for summary judgment is **DENIED**.

**IT IS ORDERED**.

				s/ Victoria A. Roberts
				Victoria A. Roberts
				United States District Judge

Dated: August 26, 2019