# EXHIBIT 2

# DEPOSITION TRANSCRIPT OF ROBERT T. CARTER

Robert T. Carter, Ph.D.
November 7, 2019

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TEOKA S. WILLIAMS,

        Plaintiff,

vs.

    Case No.
    2:18-cv-12522-VAR-MKM
    Hon. Victoria A. Roberts

BEAUMONT HEALTH,

        Defendant.
_____/


DEPOSITION OF ROBERT T. CARTER, Ph.D.

APPEARING VIA TELEPHONE

Taken by the Defendant on Thursday, November 7, 2019, at Butzel Long, 301 East Liberty, Suite 500, Ann Arbor, Michigan, at 3:09 p.m.

APPEARANCES:

For the Plaintiff:    MS. JULIE A. GAFKAY P53680
                      APPEARING VIA TELEPHONE
                      GAFKAY LAW, PLC
                      175 South Main Street
                      Frankenmuth, Michigan  48734
                      (989) 652-9240
                      jgafkay@gafkaylaw.com

For the Defendant:    MS. REGAN K. DAHLE P53975
                      BUTZEL LONG, a professional corporation
                      301 East Liberty, Suite 500
                      Ann Arbor, Michigan  48104
                      (734) 995-3110
                      dahle@butzel.com
                          AND
                      MS. HANNAH E. TREPPA P80978
                      BUTZEL LONG, a professional corporation
                      150 West Jefferson, Suite 100
                      Detroit, Michigan  48226
                      (313) 983-6999
                      treppa@butzel.com

Robert T. Carter, Ph.D.
November 7, 2019

```
 1   ALSO PRESENT
     VIA TELEPHONE:        Teoka S. Williams
 2
     REPORTED BY:          Julie L. DuCoin, CSR-4216, RPR
 3                         Verbatim Court Reporters, P.C.
                           (810) 772-1156
 4                         verbatim@charter.net
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2

Robert T. Carter, Ph.D.
November 7, 2019

7

1  Q.  Do you have both your expert report and your CV there with
2      you?
3  A.  I do.
4  Q.  Okay. Great.
5          Now, as far as your report goes, is there
6      anything that you have not yet reviewed that you're
7      planning on reviewing or that you expect to review in
8      order for you to complete your expert report in this
9      matter?
10 A.  Not that I'm aware of.
11 Q.  Okay. And, Dr. Carter, if, at any time, I ask you a
12     question that you don't understand, because I am not an
13     expert in the area in which you practice, I will likely
14     use words that maybe are the incorrect words or maybe it
15     won't make complete sense to you. If you could just let
16     me know, and I'll do my best to rephrase it so that it's a
17     question that you understand; okay?
18 A.  Yes.
19 Q.  Okay. Can you describe for me, Dr. Carter, the area in
20     which you hold yourself out as an expert?
21 A.  The area, I describe it broadly as race and culture with
22     particular focus on race-based traumatic stress in
23     situations that involve racial discrimination of some type
24     or form.
25 Q.  Okay. And is that limited to just in the employment

34

1  Q.  Let me just -- but you understand that in the law, there's
2      a legal standard in the law; correct?  You understand that
3      that could be different than what the researchers are
4      writing about in terms of the general social psychology
5      impact of racism on somebody; correct?
6  A.  No -- so the law had me a few decades ago as just
7      property, because the law can shift and change based on
8      social perceptions and sentiments and perspectives.  So
9      how the law is framed today, how it was framed 50 years
10     ago, how it was framed a hundred years ago shifts and
11     changes.
12         So I was not asked to do an analysis of the law.
13     That's not what I was asked to do.
14 Q.  Okay.  Let's go back.  You talked about how a white person
15     and a black person might interpret different events
16     differently because of race.
17         But the question I asked you about Ms. Kopriva
18     and Ms. Williams and Ms. Kalondo was a fact-based
19     question, and the facts that they understand them as to
20     have occurred, they report them differently.
21         Ms. Kopriva reports the fact that the patient
22     did not reference Ms. Williams' race.  Ms. Kalondo and
23     Ms. Williams report the fact that the patient did.
24         So in writing your opinion, whose version of the
25     facts did you believe?

72

1  discriminatory intent?
2  A. In my opinion, their failure to act exacerbated the
3     distress that Ms. Williams experienced.
4  Q. Correct.
5     But you don't know whether they acted that way
6     with the intent to discriminate against Williams or they
7     acted that way because they just mishandled the
8     investigation; correct?
9  A. It was harm either way.
10 Q. So it doesn't matter -- in your opinion, it doesn't matter
11    whether Beaumont intended to discriminate against
12    Ms. Williams or not when you're opining as to whether or
13    not she was harmed?
14 A. I wouldn't say it doesn't matter; I would say that that's
15    not my purview.
16 Q. Okay. So I'll go back to my question. Then you do agree
17    with me that it is plausible that Beaumont engaged in all
18    of the actions that it did without the intent to
19    discriminate against Ms. Williams because of her race?
20 A. I disagreed the first time, and I disagree with you now.
21 Q. So it's not plausible Beaumont acted with a
22    non-discriminatory intent in your view?
23 A. I disagreed the first time you asked, and --
24 Q. That's not my question.
25    Sir, you keep providing me conflicting answers.

81

1        in my report.
2 Q. Okay. I'm sorry, I think I must have missed -- I didn't
3        understand what you were saying there.
4        So you're confident that Dr. Marsh did not
5        discuss with Ms. Williams the racial component of the
6        discrimination here?
7 A. Correct.
8 Q. Okay.
9 A. Yes.
10 Q. Okay. I asked Dr. Marsh the following question: Did you
11        get any -- this is on Page 48 of your deposition. Did you
12        get any indication from Ms. Williams how she responded to
13        people who had racial animus towards her, I mean how it
14        made her feel? And then he answers -- he provides his
15        answer: Per her presentation, it was distressing, and
16        then he goes in further.
17        So does that change your opinion that he didn't
18        discuss with her the issue of racial discrimination or
19        racial -- or racism?
20 A. It does not.
21 Q. Okay. Is it your testimony that a white therapist cannot
22        treat an African American patient who's claiming to have
23        been the victim of racism?
24 A. It is not.
25 Q. Okay. So I think Ms. Williams testified and Dr. Marsh

Robert T. Carter, Ph.D.
November 7, 2019

82

1    testified that Ms. Williams treated with him as many as 10
2    times.
3         And how long did you meet with Ms. Williams?
4    A.  I met with her over the course of two days.
5    Q.  How many hours?
6    A.  I am not positive, but I want to say about eight, maybe
7        nine hours.
8    Q.  And did you take notes of those sessions?
9    A.  I did.
10   Q.  Okay. And have you produced those -- given those notes to
11       Ms. Gafkay?
12   A.  I can. I have not.
13   Q.  Yes. I think those would be certainly subject to
14       discovery as part of your expert report, and we'd like
15       those to be produced, please.
16   A.  No problem.
17   Q.  Your interview of Ms. Williams wasn't for the purpose of
18       providing her with psychological counseling, though; was
19       it?
20   A.  It was not.
21   Q.  Okay. And you'll agree with me that this eight to nine
22       hours of interview was occurring nearly two years after
23       the incident in question here; correct?
24   A.  Yes.
25   Q.  Okay. So would you agree with me that Dr. Marsh's

Verbatim Court Reporters, P.C.
(810) 772-1156

Robert T. Carter, Ph.D.
November 7, 2019

83

1 treatment of Ms. Williams as many as 10 times around the
2 time of the incident would be a more reliable -- or that
3 Dr. Marsh would be able to provide a more reliable opinion
4 as to Ms. Williams' emotional distress than you would be
5 able to provide?
6 A. No.
7 Q. And why is that?
8 A. I wasn't talking to her about her general psychological
9 distress as he was, nor was I trying to help her build and
10 learn coping strategies as he was.
11 My focus was on what happened to her and how she
12 was affected by it and also gathering background
13 information. So my purpose was distinctly different from
14 his.
15 More importantly, my training and background is
16 distinctly different from his. I focus on race and
17 culture both in training and in scholarship and in
18 research. He does not.
19 I went to a research oriented and clinically
20 oriented program. He was in more of a clinically oriented
21 program than I was. So I would think that while he may
22 have been effective at trying to relieve some of her
23 symptoms, the generic symptoms that she was experiencing,
24 I would not suggest that she was better or more credible
25 in understanding what happened to her, no.