# EXHIBIT 5

# PRELIMINARY EXPERT REPORT

# OF

# ROBERT T. CARTER. Ph.D.

Robert T. Carter, Ph.D. and Associates

220 Ridgewood Drive.

Lewisville TX 75067

10/11/2019


Preliminary Expert Report in the matter of Teoka S. Williams v. Beaumont Health,

submitted to

Julie A. Gafkay, PLC, Attorney at Law

175 South Main Street

Frankensmith, Michigan 48734


Background

The lawsuit was brought against Beaumont Health for violations of Federal law 42 U.S.C. 1981 and 42 U.S.C. 2000e et. seq. and the Michigan Elliott-Larsen Civil Rights Act. It is alleged that Ms. Williams suffered emotional distress and psychological injury, as a result of being racially discriminated while an employee Beaumont Health.


Qualifications

I was contacted about this case on or about November 2nd, 2018 and retained on September 12th, 2019 and was asked to submit my initial report by October, 11th, 2019. I have been retained to produce an expert report that provides a research-based context for the issues alleged in the case.

1

The analysis draws on published literature in the media, law, and social sciences to aid in the often complex and controversial issues associated with race and racism in the United States. I was also asked to evaluate Ms. Williams to determine whether she suffered any race-related emotional distress or race-based traumatic stress injury.

I am a licensed psychologist in the State of New York, and a fellow in the American Psychological Association (please see my curriculum vitae for further details).

Previous Testimony

I gave testimony in 2018 in a military criminal trial and my last deposition was taken in 2012 (please see my curriculum vitae for further details).

Fee Structure

Phase One: Expert report

The hourly fee for the first phase of the work was $400.00 per hour (including travel time) plus expenses. As well as $200.00 per hour for my research associate.

Phase Two: Deposition

The hourly fee for the second phase of the work is $450.00 an hour in advance (including travel time) and expenses.

Phase Three: Trial testimony

The hourly fee for the third phase of the work is $500.00 an hour (including travel time) plus expenses.

Documents Reviewed

2

Plaintiff's Complaint and Jury Demand

Defendant's Answer and Affirmative and Other Defenses

Defendant's Corrected Motion and Summary Judgement

Plaintiff's Reponses, Replies, and Supplemental Briefs

Opinion and Order Denying Defendant's Motion for Summary judgement

Scheduling Order (Phase II)/ Defendants Witness List and Plaintiff's Witness List

Defendant's Reply to Plaintiff's Response to Motion for Summary Judgement

Depositions of Kelly Fildrew

Depositions of Antoinette Ward

Depositions of Crystal (Fell) Kopriva

Depositions of Dustin March, Psy,D.

Depositions of Shakina Kalondo

Depositions of Olivia Moylan

Depositions David Squire

Depositions of Priti Bhardwaj, M.D.

Depositions of Teoka S. Williams

Plaintiff's T.S. Williams Answers to Defendant's First set of Interrogatories and

Document requests to plaintiff

Defendant's Response to Plaintiff's First Request for Document production

Record Identification from Dr. Priti Bhardwaj - Medical Records


Other Information Relied Upon for Report

Interviews with Teoka Williams and Kamil Pitts

Raw score from Race-based Traumatic Stress Symptom Scale (RBTSSS, Carter et al, 2013).

**The Complaint**

The events giving rise to this cause of action occurred in the Eastern District of Michigan. On or about August 9, 2018, Plaintiff received a notice of right to sue from the Equal Employment Opportunity Commission.

Plaintiff is African American. She began working for Defendant in or around July of 2008 as a Registered Nurse at Beaumont Hospital in Dearborn, Michigan. She is qualified for her position. On or about November 1 and 2, 2017, Plaintiff was assigned to work the midnight shift on 8 North.

She was assigned to care for the patients in room 881. There were two patients in the room and she was assigned to care for both at the start of her shift. The patient in 881-2 needed restroom assistance at approximately 4:48 a.m., and after providing assistance, the patient asked to speak with her supervisor. While outside the room, she heard the patient say she did not want that "Black Bitch" taking care of her. She went to the person in charge who was a clinical manager named Crystal and told her about what the patient said. She expected Crystal to inform the patient that Defendant does not accommodate requests for care based on race. Crystal talked to the patient. The clinical manager then told Plaintiff she was not to go in room 881 and if the patients needed care, a White nurse named Olivia was required to go in the room instead of Plaintiff. During Plaintiff's shift, there were times the patients in room 881 needed care and Plaintiff was forbidden to provide them care based solely on her race. Despite being denied access to room 881 to care for the patients, Plaintiff was still required by the clinical manager to give a report to the oncoming nurse concerning the patients in room 881 at the conclusion of her shift. Plaintiff complained to human resources of Defendant concerning the race discrimination. Plaintiff was told by Defendant that patient requests are honored all the time and the next time it happened she would simply be taken off the assignment altogether. Plaintiff felt harassed, humiliated and discriminated against because of the segregation of her job duties and being unable to perform her job responsibilities because of her race. Plaintiff has suffered damages as a result of the above.

4

Due to the violation of the Plaintiff's rights, she has suffered and sustained segregation in her employment, reassignment, emotional distress, and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## FRAMEWORK AND RESEARCH EVIDENCE FOR OPINIONS

My opinions in this case are considered within the social context in which racial discrimination occurs in the workplace. Race and racial encounters in the United States are complex and controversial matters. The issues in this case must be considered within the framework of how race is understood and operates in everyday life in the U.S. Moreover, it is critical to consider the race-related attitudes, behaviors, practices, and experiences that are documented by scholarship, media accounts, and empirical research evidence that people engage in, and that some members of society encounter directly and indirectly (Williams & Mohammad, 2013).

All people want to be productive citizens who wish to be respected and treated fairly. The United States has a long and painful history of racism based on skin color, physical features, and language that created, and currently maintains, structures, systems, and practices that result in racial stratification, unequal rights, and mistreatment. National polls have found that 56% of White and 71% of Black Americans believe that race relations are generally bad, and 63% of all Americans believe the historical legacy of racism remains (Pew Research Center, 2019).

The continued occurrence and impact of racism has been well documented in research and the popular press. Many respected social and government organizations have identified racism as a social-political issue that contributes to health, mental health, educational, and workplace disparities (e.g., American Psychological Association, 2016; Jones, Schmitt, & Wilson, 2018; National Healthcare Quality and Disparities Report, 2018; Smedley, Stith, & Nelson, 2003). These reports do not question the existence of racism as a current feature of everyday life in the United States.

*Race* refers to the social construction by which people in the U.S. are grouped and ranked based on their skin color, language, and physical features. *Racism*, as defined by Carter (2007), is the transformation of racial prejudice into individual racism, established through the use of power directed against racial group members who are defined as inferior by individuals,

5

institutional members, and leaders, and reflected in policy and procedures with the intentional and unintentional support and participation of the entire dominant race and culture (p. 24–25). *Racial discrimination* is the behavioral manifestation of differential treatment on the basis of race (Carter, Johnson, et al, 2019). **Racial discrimination is alleged in this matter by Ms. Williams.**

Racism and racial discrimination take many forms, which have been investigated by researchers who examine the impact of racism on mental and physical health (i.e., if there is any adverse effect on normal functioning) in settings like workplaces. One form of racism is avoidance wherein people are rejected or ignored because of their race. Another form is aversive-hostility that can occur in the workplace when people encounter barriers, or in some instances, a racially hostile environment. A third kind of racism is hostile racism or racial harassment, which includes verbal and non-verbal acts intended to demean, intimidate, silence, or communicate inferior status based on race (e.g., that the person is powerless). **The allegations by Ms. Williams would suggest that the type of racial discrimination she encountered at Beaumont Hospital, and all of the alleged incidents that transpired in her workplace are forms of hostile racism.** These forms of racism can be expressed directly as in the use of racial slurs or racial references, or through intimidation and threats. These forms of racism can also be communicated indirectly in the case of systemic racial discrimination, or through the use of coded racial language or symbols and actions that are racially-based but explained as non-racial (i.e., a bad attitude) (Brondolo, 2009; Carter, 2007; Ozier, Jones Taylor, & Murphy, 2019). **The race-based actions taken by the Hospital staff alleged by Ms. Williams were generally hostile, and generally indirect and subtle.**

Research evidence shows that regardless of the form it takes, racism is a significant stressor with decades of empirical research documenting its adverse health and mental health effects on American racial groups, and in many instances specifically Black Americans (Carter, 2007; Carter, Johnson, et al, 2019; Carter & Pieterse, 2020; Dovidio, Gaertner, Kawakami, & Hodson, 2002; Forsyth & Carter, 2012; Pieterse, Todd, Neville, & Carter, 2012; Williams & Mohammad, 2013). It is important to demonstrate that racial discrimination in the workplace of medical professionals is not aberrant or random. Furthermore, racial incidents are commonly explained away as motivated by something other than race - as personality or poor behavior, or as a way to appease someone - when the core issue is racial in nature. First, the prevalence of

racial discrimination in general is discussed, followed by how racial discrimination occurs in workplaces, which connects the information to the current case.

### Prevalence of Racial Discrimination

**What is important about the alleged events at Beaumont Hospital directed at Ms. Williams is that the types of racial events alleged are common in many areas of life in North America.** Researchers demonstrate that racial discrimination is pervasive in various areas of life (e.g., schools and work). In my own investigations (Carter, Forsyth, Mazzula, & Williams, 2005; Carter, Forsyth, Williams, & Mazzula, 2007) of 233 Black, Asian, Biracial, and Hispanic peoples' experiences with racial discrimination, I found that 89% of the participants had experienced perceived racial discrimination. Recent studies have found that African Americans, in particular, face high rates of racial discrimination. For example, in a study using data from the Pew Research Center's *2016 Racial Attitudes in America Survey*, 43.5% of the total sample reported having experienced racial discrimination from time to time or regularly. About a quarter of Whites (26.5%) in the sample reported experiencing racial discrimination from time to time or regularly as compared to 69.45% of Blacks (Lee, Perez, Boykin, & Mendoza-Denton, 2019). In another study using data from a national probability sample from a longitudinal study (conducted over a 15-year period) that included White (1,813) and Black Americans (1,507), Borrell and colleagues (2013) found that most (89.2%) Black Americans experienced racial discrimination in one of several domains (e.g., getting a job, at work, housing, medical care). In comparison, only 40% of White Americans reported experiencing racial discrimination in at least one domain.

Discrimination, experienced by all racial groups, continues to be a prominent and critically important matter in American life, as it has been throughout American history. In the multiple *Discrimination in America* (NPR, 2017A; NPR, 2017B) reports on the experiences of each racial group (Whites, Blacks, Asians, Latino/as), the surveys asked people about their own personal experiences with discrimination. Whites believe they encounter discrimination because of their race (55%), yet few reported personal instances of racial discrimination (NPR, 2017B). Among Whites who reported personal discrimination, they stated that this happens when applying for jobs (19%), in receiving equal pay or promotions (13%), or when applying to or attending college (11%).

7

Blacks reported that they have experienced both individual and institutional racial discrimination in many areas of life. In particular, more than 50% of Blacks surveyed noted that they had personal experiences with the police (hostile), when applying for jobs (avoidant), and when being considered for promotion. Among respondents who lived in suburbs and earned higher incomes, 51% reported that they encountered racial slurs, negative assumptions about them, and offensive comments; 42% reported that people have acted as if they were afraid of them; and 40% experienced instances of racial violence (NPR, 2017A).

Some research studies that focus only on African Americans found similar results to those found in mixed race samples. A study using male data from the Family and Community Health Study (FACHS), a multisite, longitudinal investigation of African American families, found that the vast majority (95.5%) of the sample reported having had an experience of racial discrimination (Sutton, et al, 2019).  In summary, research on the frequency of exposure to racism and racial discrimination among Black Americans shows that it occurs in a variety of settings with high prevalence rates.

### Subtle Racial Discrimination

Following the 2008 presidential election, in which a Black man was elected,  some believed that race relations in the U.S. had improved and race as an issue was less salient, however recent research has shown that 60% of Americans believe race relations have worsened following the 2016 presidential election of Donald Trump (Pew Research Center, 2017). Further, it appears that blatant racism is on the rise according to the Justice Department report on hate crimes, such crimes have increased 17% from 2016 to 2017 (U.S. Department of Justice, 2017). While overt racism has increased, researchers point out that racism and discriminatory practices usually are more subtle. In essence it has been shown that individuals (some in power, some not) are able to engage in racially biased actions while disguising these actions as promoting individual opportunity and mobility (Deitch, Barsky, et al., 2003). Further, some scholars have shown that subtle forms of discrimination can be equally and often more harmful than overt acts (Jones, Peddie, et al., 2016).

While most people today would maintain that they do not hold racist views, researchers have found subtle racially biased actions and behaviors have the same outcomes as did the old-fashioned variety of overt racism and are also more damaging than "conventional racism" (Brief

8

& Barsky, 2000; Dovidio & Gaertner 2002). Scholars argue that subtle racial experiences can be more emotionally and cognitively taxing on the target, who is left to wrestle with how to explain an ambiguous and harmful incident (Carter, Johnson, et al., 2016; Jones, Peddie, et al., 2016).

Subtle racial discrimination is correlated with poorer psychological health, including anxiety, depression, and overall stress (Nadal et al., 2014; Yoo, Steger, & Lee, 2010; Utsey, Chae, Brown, & Kelly, 2002), and has been linked to negative physical health correlates including compromised cardiovascular health and disturbances in sleep (Lewis, Everson-Rose, et al., 2006; Ong, Cerrada, Lee, & Williams, 2017). In addition, subtle racial discrimination is associated with poorer physical health, specifically compromised cardiovascular health, as well as increased unhealthy behaviors, such as alcohol and illicit drug use (Miscally, 2009).

Thus, for African Americans, subtle racial discrimination is neither hidden nor insignificant. Dovidio et al. (2002) and Essed (1991) show in their respective research that for African Americans, the more subtle forms of racism and discrimination add to the denigration of their "lived experience". Dovidio, Gaertner, and Pearson (2017) offer evidence from a range of studies as to how and under what situations racial bias is likely to be enacted. Researchers demonstrate that the impact of "modern racism," although more subtle, can be intensified given the lack of attention it is given by those in authority, such as in a work setting (Dovidio & Gaertner, 1996; Utsey, 2001). These studies and others like them support the notion that racial bias and racism are not always overt acts of racial animus but can also be racial bias disguised with non-racial justifications. Subtle racism can be seen in the differential weighing of applicant credentials in college admissions and employment decisions (Dovidio, et al., 2017). One setting where subtle discrimination occurs is in the workplace as we now discuss.

### *Workplace Racial Discrimination*

Discrimination in the workplace is prevalent in the United States. A 2018 report found that workplace discrimination was the most commonly reported type of discrimination for all racial groups, with Black people reporting the highest rates: 57% reported discrimination in equal pay and promotions and 56% reported discrimination in hiring (NPR, 2018). In a recent nationally representative survey, 82% of Black Americans felt that Blacks are treated less fairly in hiring, pay and promotions (Pew Research Center, 2019). A recent prevalence study found that Blacks were 7 times more likely than Whites to experience discrimination in the workplace

9

and that Black women were 10 times more likely than White women to experience workplace discrimination (Fekedulegn, Alterman, et al., 2019).

A meta-analysis of over 400 studies of workplace mistreatment found that members of racial minority groups were significantly more likely to report experiencing race-based mistreatment than White workers (McCord, Joseph, Dhanani, & Beus, 2018). The most recent statistics from the Equal Employment Opportunity Commission (EEOC) provide further documentation of the prevalence of racial discrimination in the work setting. In 2018, the EEOC received 24,600 cases of alleged race-based discrimination (EEOC, 2018A) including 8,533 cases of racial harassment (EEOC, 2018B). These included litigation related to various issues such as job assignment, demotion, discharge, harassment, and intimidation (EEOC, 2018C). It is likely that most of these prevalence statistics underestimate the actual frequency of racial discrimination in workplaces due to the fact that most studies ask direct questions about explicit experiences of discrimination, while most workplace discrimination is far more ambiguous and subtle and therefore less likely to be reported (Deitch, et al., 2003; Jones, et al., 2017; Offerman, Basford, et al., 2014). Additionally, it has been documented that most targets of workplace harassment do not report their experiences to anyone for fear of retaliation (EEOC, 2016).

Workplace discrimination is associated with a variety of poor mental and physical health outcomes including drinking (Chavez, Ornelas, Lyles, & Williams, 2015; Rospenda, Richman, & Shannon, 2009), smoking (Purnell, Peppone, et al., 2012), depression (Hammond, Gillen, & Yen, 2010), and psychological distress (Rospenda et al., 2009). A meta-analysis of 79 studies of workplace racial discrimination between 1980 and 2013 found associations with poor physical health outcomes (blood pressure, pain, poor general health, illness, and drug and alcohol use); poor mental health (stress, other psychological symptoms, negative affect, poor self-esteem and lower life satisfaction); and perceived unfairness in the workplace (Triana, Jayasinghe, & Pieper, 2015).

Perry, Murphy, and Dovidio (2015) point out that the change in the legal landscape as well as changes in societal norms toward egalitarianism, have discouraged most overt forms of discrimination in the workplace, but in turn have led to increased subtle discrimination. Subtle racial discrimination allows the perpetrator(s) to maintain that they are non-prejudiced while using other non-racial explanations for their behavior. Researchers have found that today workplace discrimination and harassment is often more subtle, ambiguous, and difficult to

attribute directly to race (Jones, et al., 2017; McCord et al, 2018). Examples of subtle discrimination identified in verified EEOC complaints include a variety of formalized procedures and everyday practices that occur in spite of official antidiscrimination policies and structures such as basing performance evaluations and promotion decisions on the use of ostensibly race-neutral and meritocratic criteria, such as soft skills (e.g., attitude, friendliness, commitment, appearance), that is often subjective, arbitrary, and vulnerable to the influence of conscious or unconscious stereotypes and racial bias; differential application of rules, penalties and sanctions for actual poor work performance; and ongoing harassment and mistreatment (Light, Roscigno, & Kalev, 2011; Roscigno, Williams, & Byron, 2012).

Subtle discrimination can be particularly pernicious because of its ambiguity and often chronic and cumulative nature, which leads to prolonged attempts to determine whether acts are racially motivated, leading to protracted rumination and increased potential for self-blame (Jones et al., 2017). Furthermore, target's responses, reaction and attempts to cope with subtle discrimination such as psychologically or behaviorally withdrawing or speaking out, can perpetuate cycles of increased isolation and or retaliation (Cortina & Magley, 2003). These complex aspects contribute to the serious psychological impact for targets. A meta-analysis of 44 studies conducted between 1996 and 2011 found that subtle discrimination is just as harmful as blatant discrimination (Jones et al, 2016). Thus, targets of more subtle discriminatory practices seem to have less recourse in battling and seeking restitution while having to endure the negative effects, in some instances, in silence.

### Racial Discrimination in Nursing

Healthcare workplaces have struggled with racial equality and racial minority representation for many years. Although African Americans and Hispanic Americans make up 31.7% of the total United States population in 2018, they represented only 11.5% (6.2% and 5.3%, respectively) of registered nurses, compared to 80.8% of their White counterparts (Smiley, Lauer, et al., 2017). Beyond being numerical minorities amongst their peers, evidence shows racial minority nurses experience racial discrimination during and after their nursing education (Hall & Fields, 2013). Studies show that nurses face widespread subtle and blatant racism from multiple people such as program administrators, faculty, peers, and patients (Porter & Barbee, 2004; Wheeler, Foster, & Hepburn, 2014).

11

Subtle racism is a commonplace experience for racial minority nursing students and professionals that occurs in many ways and is perpetrated at the individual level (from peers, supervisors, and patients) and the systemic level (in the form of disparities in pay and opportunities). The research findings highlight the pervasiveness of racial disparities in nursing education and practice for racial minorities. Nursing students and professionals encounter subtle racism in the form of biased evaluations, and underestimation of their competencies as nurses. Graham et al. (2016) found that racial minority nursing students believe their work was evaluated more poorly than their White counterparts. Talley, Talley, and Collins-McNeil (2016) found the presence of a similar phenomenon in the nursing profession, where practicing nurses found their supervisors' evaluations to be racially biased and harsher than that of their White peers. Nursing students also felt rules in nursing programs were more strictly applied to racial minority students (Thomas, 2009).

For nursing students, this typically occurred by the lack of support from faculty, program administrators, and exclusion felt from White peers. Thomas (2009) found that nursing students of color frequently were turned away when asking for help from faculty or referred to seek support from others such as peers. Graham et al. (2016) found racial minority students were excluded from activities that could potentially increase their academic success such as being left out of study groups and the sharing of study guides, as well as being picked last for laboratory assignments.

**In reference to Ms. Williams' case, it is important to show how reporting racial discrimination has been treated in nursing programs and in the nursing profession as a whole.** Hagey and colleagues (2001) examined the experiences of nurses of color after filing grievances or complaints following repeated experiences of racial discrimination. Study findings revealed that after filing grievances participants reported similar patterns such as differential treatment as in denial of privileges afforded to White nurses, and increased disputes with nursing managers. Once disputes arose, nurses of color were typically labeled as the problem, and treated as such by nursing managers documenting the nurse's behavior and labeling the nurse of color as "aggressive, rebellious, and unmanageable."

In addition to subtle racism experienced by nurses and nursing students, racial minority, and specifically Black nurses report frequent experiences of blatant racism. Black nursing professionals reported blatant racism in the form of racially derogatory statements from peers

and supervisors, but most frequently from patients, some with dementia, and their family members or visitors (Cottingham, Johnson, & Erickson, 2018; Truitt & Snyder, 2019). Others highlight how patients make racially offensive comments to nurses of color, despite having no medical issue to justify such behavior.

### Race-Based Patient Refusal

Along with efforts to increase the racial/ethnic diversity of healthcare professionals, there has also been an increase in patients refusing care based on the race of the care provider (doctor or nurse) (Paul-Emile, Smith, Lo & Fernandez, 2016). A 2017 study of over nearly 1200 health professionals found that 59% of doctors, 53% of nurses, and 55% of nurse practitioners experienced offensive remarks from patients about their racial or social identity in the past 5 years, with ethnicity and race being the most common characteristic, and 47% of doctors had had a patient request a different doctor (Tedeschi, 2017). In the same study, 53% of nurses and 55% of nurse practitioners experienced offensive remarks and 34% of nurses and 44% of nurse practitioners had had a patient request a different nurse (WebMD Health News, 2017). The study found that African American and Asian doctors were the most common targets, with 70% and 69% respectively reporting that they had experienced biased verbal remarks from patients in the past 5 years (Watson, 2017), but statistics by race was not reported for nurses. Although patients selecting physicians by race is a widespread practice in outpatient settings, it presents legal and ethical dilemmas when it occurs in an inpatient hospital (Paul-Emile, 2012).

The emphasis of most of the academic literature on patient refusal is on physicians, yet nurses are more vulnerable to abuse from patients since they spend significantly more time with patients than doctors (Gunaratnam, 2001). Moreover legal action related to patient refusal has only been brought by nurses or nurse's assistants, not physicians, in part due to the fact that: (1) physicians are independent contractors and are not protected by Title VII, and nurses and nurse's assistants are; and (2) physicians have decision-making power regarding patient reassignment, and nurses and nurse's assistants are often forced by management or supervisors to be reassigned when patients refuse care from them (McCruden, 2017; Paul-Emile et al., 2016).

Although the American Medical Association' adopted policy in 2009 urging hospitals to adopt uniform guidelines to address racially motivated health professional abuse (American Medical News, 2013), until recently, most hospitals do not have explicit policies regarding how

patient preferences for medical personnel based on bias or racism should be addressed (for an exception, see Penn State Health Patients' Rights Policy, 2018), but a number of articles had been published, before the 2017 incident, in academic journals from a variety of medical specialties, nursing, social work, and the law, that provide ethical guidelines, legal analysis, case descriptions of the successful ethical handling of such incidents, as well as specific information and recommendations about how these situations should be handled by health professionals in inpatient settings (Brady, 2013; Gronningsater, 2012; McCruden, 2017; Paul-Emile, 2012; Paul-Emile, et al, 2016; Reynolds, Cowden, Brosco, & Lantos, 2015; Schapira, Gordon-Rowe, et al., 2018; Singh, Sivasubramaniam, Ghuman, & Mir, 2015; Whitgob, Blankenburg, & Bogetz, 2016).

   According to legal analysis and reading of the law (Title VII of CRA 1964-1991), inpatient medical settings cannot cater to the discriminatory preferences of patients (Gronningsatar, 2012; Paul-Emile et al., 2016), and more importantly, legal precedent has established that Title VII trumps state laws that protect patients' right to choose their own provider, preventing long-term care facilities from accommodating patient's race-based preferences under any circumstances (Chaney v Plainfield Health Center, 2010; Gronningsatar, 2012). According to the 7th Circuit Court of Appeals decision in *Chaney v PHC* (2010), patients in nursing facilities have the right to choose their own providers. While preferences for same-sex providers can be honored, the selection of care provider based on race or ethnicity is explicitly prohibited by Title VII.

   The *Chaney* decision recommended a variety of "reasonable measures" (p. 5) that healthcare facilities can take to effectively prevent or manage these situations while protecting employees from racism and bigotry that apply to inpatient hospital settings, including explicitly and proactively advising staff that they have the right to request protection from racially bigoted or offensive patients before and/or when an incident arises, informing patients of general nondiscrimination policies either in advance of and/or upon admission, and even securing patients' written consent with nondiscriminatory policies and establishing behavior contracts to support patients in changing problematic behaviors. In her analysis of the Chaney decision, Gronningsater (2012) builds upon these recommendations, suggesting that the management of hostile patients should be a "team decision" (p.348) so as to prevent the perception that any particular health care professionals' experience with a racist patients is being dismissed, thereby

14

infringing upon their rights under Title VII and affecting their well-being. She also argues that cross-cultural training of healthcare staff could further inculcate the hospital against damage in these situations by creating a staff culture that facilitates open exchange among racially diverse staff who are competent to work together to effectively manage racially challenging situations. Finally, she suggests that healthcare facilities should establish zero-tolerance discrimination policies, not only for staff, but for patients as well, and that these policies should be clearly articulated to patients as part of their rights and responsibilities, and enforced via direct communication with patients. **Beaumont Health's *Patient Rights and Responsibilities* states that patients "have the right to refuse care as allowed by law", but also makes it clear that they are responsible to "treat staff, visitors and other patients with respect, and refrain from physical and non-verbal language or behavior that is offensive, abusive or intimidating" (Beaumont Health, retrieved from https://www.beaumont.org/patients-families/patient-rights on September 18, 2019).**

Paul-Emile and colleagues' 2016 article, "Dealing with Racist Patients" in the *New England Journal of Medicine*, which provides explicit guidelines for ethical decision-making in cases of racist patient refusal, is widely cited work on the subject; (it has been viewed over 144,000 times and referenced in popular publications and broadcasts including the *New York Times, Wall Street Journal, The Guardian, Washington Post, National Public Radio, CBS News, MSNBC, CNN,* and *Al Jazeera America*, retrieved from https://www.fordham.edu/info/23169/kimani_paul-emile on 9/20/19).

Paul-Emile and colleagues argue that patient refusal based on discrimination/prejudice should only be accommodated in cases where, it is known that, the patient has a history of an extremely negative and traumatic experience with a person of the same race as the attending health professional that would be detrimental to their care. The authors assert that institutions should not accommodate race-based refusal requests from patients in stable condition "who persist with reassignment requests based on bigotry" (p.711), and recommend that an on-call administrator be the one to inform the patient of their "responsibility to refrain from hateful speech," (p.711).

Publications in health journals providing case descriptions of the successful handling of race-based patient refusal, commentary, and qualitative research-based recommendations for health professionals in inpatient settings are consistent with Paul-Emile and colleagues in their

recommendations regarding the ethical handling of these incidents. They argue that honoring racist requests communicates tacit approval, legitimizes such requests, can be experienced by the targeted staff as dismissive and harmful (McCruden, 2017; Reynolds, 2015; Schapira et al., 2008; Singh et al., 2015), and some even assert that acquiescing to such requests without challenging them makes those who do so "accomplices" in the patient's racist behavior (Schapira et al., 2008). They recommend that either the provider responsible for the patient or a supervisor speak directly with the patient to get more information from the patient to assess their request (Reynolds et al., 2015; Schapira et al., 2008), and in so doing should not overlook the use of "coded language that implies racist beliefs" (p. 1179, Schapira et al., 2008). If bigotry is confirmed, staff should let the patient know that such requests cannot be accommodated, and stand up for the targeted provider (Brady, 2013; McCruden, 2017; Reynolds, 2015; Schapira et al., 2008; Singh et al., 2015). <u>Authors emphasize the need to center the needs and experiences of the targeted provider in dealing with these situations in order to acknowledge the psychological impact the event may have on them, and to minimize this impact by providing support and agency in decision-making around how best to address it</u> (Brady, 2013; McCruden, 2017; Schapira et al., 2008; Whitgob et al., 2016). Most recommend a team approach where providers consult with colleagues, more senior staff (Brady, 2013; McCruden, 2017; Reynolds et al., 2015; Whitgob et al., 2016), hospital ethics teams, or multidisciplinary teams established to deal with dangerous or difficult patients (McCruden, 2017).

**Given the frequency of incidents with race-based patient refusals and the coverage of how to handle these incidents in medical and health journals, it would seem reasonable that hospitals would have policies and procedures in place for handling these types of situations. However, it seems that Beaumont Hospital did not have a policy in place at the time of the incident Ms. Williams alleges.**

### *Recognizing Racial Discrimination*

Although the research consistently indicates that rates of racial discrimination and harassment continue to be high, particularly for African Americans, there are differences in how people recognize and react to these experiences that account for the differences in reporting encounters with racial discrimination. It is important to note some of the reasons for the differences in recognizing racial discrimination.

The lack or absence of this general knowledge about race and racism can make it difficult for one to understand and recognize the meaning of racial discrimination or hostile racial environments.  The general knowledge necessary for processing racial information is consistent with empirically supported models of racial identity statuses, which have been empirically associated with perceiving discrimination (e.g., Carter, 1995; 2005; Forsyth & Carter, 2012). Thus, for a Black person to recognize racial discrimination or a racially hostile environment, she should have racial self-awareness and general knowledge about the nature of race relations in the U.S. With this awareness it is possible to recognize, react, and cope with and be harmed by blatant or indirect encounters with racial discrimination and hostile racial environments.

### *Pathways of Harm from Racial Discrimination*

Carter (2007), Carter, Muchow, and Pieterse (2018) and Williams and Mohammed (2013) state that racism and racial discrimination effects mental health through multiple pathways.  One is the restriction on access and opportunity, another is exposure to unhealthy or demanding work or living conditions, and a third is exposure to negative stereotypes that justify racial differences. These pathways may lead to impaired health and psychological functioning due to the stress they produce (Carter, 2007; Carter & Pieterse, 2020). Decades of research using a variety of methods and measures of different types of racism and discrimination with a variety of racial minority groups has found that racism has a negative impact on health and mental health.

Health Effects: Empirical studies show that racial discrimination can have a powerful impact on physiological and biological systems. This physiological stress-related impact provides strong evidence that racial discrimination and harassment can also have powerful and significant impact on one's psychological and emotional state. Earnshaw et al.'s (2016) study of everyday discrimination and physical health effects on mental health outcomes involving 1,299 adults who participated in a community health survey, sought to discover whether stressors from discrimination would be related to physical health status and symptoms of depression in Black, White, and Latina women. They found that the more discrimination experienced, the greater the stress and depression; and the higher the level of depression, the more overall health declined. Some participants reported that they had at least one visit to the emergency room and had a diagnosis of one or more chronic illnesses. The authors noted that their findings were "consistent

with Carter's model of race-based traumatic stress injury, . . . results suggest that more frequent experiences of everyday discrimination are associated with greater stress, which in turn is associated with poor health outcomes" (p. 8).

In a related study, Black, Johnson, and VanHoose (2015) reviewed ten years of racial discrimination studies and health research involving Black women to see if racism and health were related. They located 19 studies they could analyze for the relationships and found that the strongest evidence of racism's health effects was on birth outcomes wherein the greater the racial discrimination exposure, the lower the birth weight and related factors. Illness and racism were also shown to be correlated in these studies, including associations between exposure to racism and cancer and tumor risk. The authors observed that "repeated exposure to . . . . racism and discrimination serve as chronic stressors for blacks that can start a cascade of physiological responses resulting in disease and early death" (Black et al., 2015, p. 7).

Mental Health: The negative effects of discrimination on mental health are well documented (Carter et al., 2019). Even relatively minor race-related experiences can result in a great deal of suffering, particularly when efforts to cope and adapt fail, resulting in a stress response that can lead to trauma. Empirical studies have found significant links between self-reported experiences of racial discrimination and negative mood, depressive symptoms, feelings of hopelessness, anxiety and psychological distress (Carter, Muchow, & Pieterse, 2018; Carter, Lau, et al., 2017; Pascoe and Richman, 2009).

Meta-analysis studies reveal that racial discrimination is associated with harmful psychological symptoms (Pieterse, Todd, Neville, & Carter, 2012; Triana, Jayasinger, & Pieper, 2015). Similarly, Britt-Spells, Slebodnik, Sands, and Rollock's (2016) meta-analysis of 12 studies involving Blacks examined and found effects of discrimination on depression. Similarly, in a longitudinal study (1996–2001), Schulz et al. (2006) examined the relationship between experiences of discrimination over time and depression among 343 African American women living in the Midwest. The researchers found that women who report increased experiences of discrimination over time also report increases in depressive symptoms and decreases in self-rated general health irrespective of age, education, or income. Thus, the study supports the conclusion that everyday encounters with racial discrimination are associated with anxiety and depression symptoms for Black people.

18

Another meta-analysis by Lee and Ahn (2013) examined how racial identity, ethnic identity, and racial socialization are related to racial discrimination and stress and found that racial discrimination and psychological distress are significantly and positively related. Further they found that this relationship varies based on racial identity and racial socialization, but that ethnic identity is not related to distress or racial discrimination. Pieterse, Todd, Neville, and Carter (2012) conducted a meta-analysis of 66 studies that focused on the mental health impact of racism on Black adults and the researchers found a positive association between racism and psychological distress.

Carter, Johnson, et al. (2019) conducted a meta-analysis of 242 studies (1,805 effect sizes) with people of color that examined the correlations between racial discrimination dimensions (e.g., frequency, timeframe), physical and mental health, substance use, and cultural outcomes (e.g., acculturation, racial identity, and racial socialization). They found across racial groups that the direct overall relation between racial discrimination, health, and culture is strongest for mental health ($r = 0.21$), then substance use ($r = 0.16$), cultural variables ($r = 0.10$), and physical health ($r = 0.07$). Findings indicate for Blacks specifically, the same pattern emerged where the relation between racial discrimination and health was strongest for mental health, followed by substance use, cultural variables and physical health.

**In summary, depression and anxiety, as has been reported by Ms. Williams, have been consistent findings of harm to people of color due to racism and racial discrimination; Additional harms include mental health severity, psychological distress, and difficulty with problem-solving and mastery of life challenges. Despite the strong empirical evidence indicating that racial minorities who report experiencing racial discrimination or harassment find these encounters to be sources of stress and psychological harm (i.e., increased anxiety and depression, lower self-worth, and trauma), yet the mental health impact of racial incidents is not specifically considered in the psychiatric diagnostic manual (DSM-5, American Psychiatric Association, APA, 2013).**

### *Racial Differences in Exposure to Stress*

Scholars and researchers have documented many ways in which stress affects our lives by hampering health and contributing to illness (Taylor, 2018). Taylor (2015) defines stress as: "a negative emotional experience accompanied by predictable biochemical, physiological,

cognitive, and behavioral changes that are directed either toward altering the stressful event or accommodating to its effects" (p. 113). How we think, feel, and behave, and who we are all influence our reactions to stress. Whether we are male or female, our racial group, and our social position, among other things, contribute to how we react to stressors and process stressful experiences. People of color are exposed to more major stressors that are associated with higher rates of illness when compared to Whites (APA, 2016; Brondolo, Ver Halen, Libby, & Pencille, 2011; Chandola & Marmot, 2011), and stress is greater if a person's efforts to survive are involved (i.e., their livelihood or work) as is the case in this matter. **It is reasonable to conclude that a work-related racial stressor would have the potential to be psychologically harmful to Ms. Williams.**

Sternthal, Slopen, and Williams (2011) report racial group differences in exposure to eight stressors (life events, employment, life, discrimination, job discrimination, and so on), and they found that Blacks were exposed more than members of other racial groups and had more stressors. Latino/as had similar patterns to Blacks. More important, the stressors were strongly associated with poor mental and physical health. It is clear that racism and racial discrimination are sources of stress and that race-related stress has significant health implications (see Carter & Pieterse, 2020).

Some life events and experiences that are stressors are severe, and the stress from such experiences can become traumatic (Carter & Pieterse, 2020). Researchers of life event stress have shown that there is a difference between daily life events and ones that are less frequent and life threatening (e.g., disasters). Everyday life events such as marriage, relocation, and work-related activities, are usually not life-threatening. Both types of life events are threats to health, yet the key and critical difference is the level of severity of the stress experienced. Carter (2007) points out that people judge stressors and endeavor to manage stress,

> but if the appraisal is that the stressor is unwanted and negative, some action to cope and adapt is needed. When coping and adaptation fail, one experiences stress reactions. Although trauma is a form of stress, it is distinct in that it is a more severe form of stress understood in terms of both the nature of the stressor(s) and the type of reaction to the stressor(s). Thus, *trauma* has been defined in two ways: as **PTSD**, and as **Traumatic Stress** (p. 19).

PTSD results from "exposure to actual or threatened death, serious injury or sexual violence in one of the following ways: . . . directly experiencing the traumatic event, [or] witnessing, in

person, the event as it occurs to others" (*DSM-5*, American Psychiatric Association, 2013, p. 271)." The *DSM*'s authors regard trauma as having a series of symptoms, such as intrusion and avoidance, that must occur for PTSD to be diagnosed. Carlson (1997) offers a definition of "Traumatic Stress" as the reaction to <u>emotionally painful events</u> that are <u>sudden, negative, and out of one's control</u> and that result in primary symptom clusters that include avoidance, arousal, and intrusion as well as other reactions (e.g., depression).

Carter has demonstrated that **traumatic stress, which is what is being used in our assessment of Ms. Williams, could result from workplace encounters with hostile racial discrimination such as the type alleged by Ms. Williams** (Carter & Pieterse, 2020).

### Race-Based Traumatic Stress Injury

Racism as a stressor functions in the same way as other stressors. The psychological and emotional harm experienced by targets of racial discrimination or harassment is captured in the clinical literature under the category of race-related stress which is defined as a person-environment, biopsychosocial interaction, wherein environmental events such as racial hostility (stressors) are appraised in two ways. First, events are appraised as, unwanted and/or negative. The initial appraisal is followed by a secondary assessment that is focused on an effort to cope and adapt to the event(s). If the appraisal is that the stressor is unwanted and negative than some action to cope and adapt is necessary. If attempts to cope or adapt fail, stress reactions intensify.

The extent to which a person is affected by stress depends on their personal characteristics and predispositions. When coping and adaptation fail one experiences continued stress reactions that have physiological and psychological manifestations. Trauma is a form of severe stress that is distinct from general life stress in terms of both the nature of the stressor(s) and the type of reaction to the stressor(s). Harm occurs when coping fails, the stress is prolonged, or the stress produces trauma. Trauma reflects a more intense or severe stress experience characterized by specific types of reactions, signs and symptoms that interfere with a person's capacity to function. Thus, while a stressful experience can help one adapt, it can also be harmful to one's health (Carlson, 1997).

According to Taylor (2018), the intensity of stress increases when an event is perceived as negative or unwanted, unpredictable, and uncontrollable. Stress is greater if an unwanted or negative event occurs in central aspects of one's life (i.e., at work, in one's home). Researchers report that these types of negative life events tend to be stronger predictors of depression. Stress

21

reactions occur whether the stressor(s) are objective (e.g., sudden death or accident) or subjective (e.g., perceived discrimination), and in research both have been shown to independently predict adverse psychological and health effects. It is important to highlight that some people exposed to stressful situations or events can adapt and cope effectively with them while others may not (Taylor, 2018). Studies have documented a range of mental health effects, which result from the stress of discrimination when efforts to cope with the stress of perceived racial discrimination or a racially hostile environment fail.

Race-based traumatic stress is triggered by emotionally painful or negative racial experiences that are sudden and out of one's control, and that result in symptom clusters that include avoidance, arousal and intrusion, as well as other reactions (e.g., depression, anger, anxiety; Carter & Pieterse, 2020). Carlson notes that, "Regardless of whether an event is predictable, it will be traumatizing if it is experienced as uncontrollable and sufficiently negative . . . It seems that predictability could even cause experiences to be more traumatic since the stress and tension of waiting for uncontrollable negative experiences could lengthen the period of distress" (p. 33). It is not possible to know when or how one may encounter specific racial incidents or what emotional or psychological impact the encounter will have.

Race-based traumatic stress injury has at least two core reactions that may be expressed through one or several modalities (physiological, emotional, cognitive, or behavioral). They are intrusion, arousal, and avoidance. Symptoms of intrusion or re-experiencing includes having thoughts or images that "intrude" on daily life, experiencing recurring images of the encounter (re-experiencing), or having difficulty with concentration. Arousal or hyperactivity includes feeling anxious or expressing anger through aggression or hyperactivity, experiencing sleeplessness or being easily startled, or experiencing a state of constant alert. Avoidance can be expressed as psychic numbing, becoming distrustful and emotionally detached from people, becoming emotionally "numb" and losing interest in pleasurable activities, denying any connection between one's current emotional and psychological state and the incident, or having limited recall for specific elements of the event(s), and staying away from the people or the location of the event (Carter et al, 2013).

The core reactions of intrusion, arousal and avoidance that people experience may manifest in other symptoms, such as depression and anxiety that reflect or contain elements the core reactions. Similarly, one may experience a loss of self-worth or one may have difficulty

22

with intimate and interpersonal relationships.  Guilt and shame may arise due to self-blame and a sense of responsibility for the experience. Targets of hostile racial environments may experience reactions such as depression, low self-esteem, self-doubt, and emotional pain. The psychological injury may be manifested in constant fear and/or a lack of security in one's well-being.

For assessing racial incidents, it is most accurate to employ the notion of psychological injury wherein the cause of distress or trauma is an emotional assault. **The injury in the current case is primarily psychological and emotional**.

Furthermore, it should be pointed out that the manner in which a particular person responds to the experience of perceived racial hostility depends on the specifics of the event, the nature and type of support they have, and their own ability to cope. Targets of racial harassment typically describe feelings of shock, confusion, helplessness, general anxiety, generalized fear, negative self-concept and feelings of low self-esteem, frustration, bitterness, anger and rage, as well as any combination of these feelings. The symptoms and feelings can result in altered social lives, as well as rage, fear and alienation. Research has shown that some people have more difficulty coping with encounters of racial hostility or a racially hostile environment (Brondolo et al., 2009).  Thus, such people will be more likely to suffer harm and emotional injury from a hostile racial environment.

### *Coping with Racial Discrimination*

Black people have learned to cope with racial discrimination and harassment in many different ways, from denial to over achievement, yet it is clear from research that they generally expect people in positions of authority to be helpful, not demeaning. Therefore, while Blacks' struggles with racial discrimination or harassment may not be consistently overt and observable, it would be erroneous to conclude that they do not make efforts to struggle and cope with these types of experiences. Feagin and Sikes (1994) and Brondolo et al (2009) describe coping strategies Black people use in their effort to deal with encounters with racial discrimination. People often avoid the situations and people associated with the racial harassment or discrimination or they deny the action was based on race to avoid conflict. They may minimize the problem or do nothing for fear of contributing to or creating more of a problem. On more rare occasions, some will confront the perpetrator, but this means of coping comes with a cost. "[B]y regularly confronting whites. . . . [B]lack Americans run the risk of being ostracized or labeled"

as problems or troublemakers (Feagin & Sikes, 1994, p. 282) because Whites might deny that the event or encounter was due to race or racial discrimination and thus indirectly blame the racial minority who complains, or dismiss their claim as false (Bryant-Davis & Ocampo, 2005). Furthermore, in cases where the discrimination or harassment is particularly severe, people may fear that confrontation will result in increased conflict and harm. As a result, many people choose to withdraw and many become distrustful. Still others may be more active in their coping by being defiant and assertive. They may lodge verbal complaints or they may cope by taking legal action (Brondolo et al., 2009; Feagin & McKinney, 2003).

## OPINIONS

This report and the opinions contained within are <u>preliminary and subject to revision</u> once and if other testimony becomes available. According to Ms. Gafkay, she needs the report on or before October 11th 2019. While I submit this <u>initial report</u> to comply with stated timelines, it may be that I have not reviewed all testimony or information that might be relevant to the facts of this case. <u>Therefore, my opinions may change if additional information becomes available.</u>

My opinions are based on my training, experience, and research that I and others have conducted on racial-cultural issues, as well as upon an analysis of the legal, social science and psychological research literature about the psychological, emotional and health impact of racial discrimination. My opinions in the case, are also derived from interviews I conducted with Ms. Williams and Ms. Pitts and documents that I reviewed (see list above).

*I hold the following opinions to a reasonable degree of professional certainty:*
**Power differences between Ms. Williams and her supervisors, human resources (HR) staff, and her co-workers played a central role in the psychological and emotional injuries she alleges.**

A critical aspect of this case that frames the situation and helps one to understand the behavior and emotional reactions of Ms. Williams is the power differences between her, her supervisors, and the hospital leadership (human resources and related positions). Her primary recourse was to follow the chain of command and leadership on her floor and to report her concerns about racial discrimination on the part of her patient, supervisor, and the hospital personnel to those above her. Thus, Ms. Williams was responsible for addressing any concerns

24

she may have had. The hospital personnel (i.e., charge nurse assistant manager, the nurse manager, and other human resources personnel) did not act on Ms. Williams' allegations of racial discrimination on the part of the patient and the nurses in charge of the floor. Additionally, the HR department's staff, after being informed of the matter, did not act or investigate her claims according to Ms. Williams, thus leaving her powerless to address her treatment by the hospital.

Researchers have found high rates of cultural mistrust among African Americans, which is a tendency to distrust Whites and mainstream institutions as a result of an extensive history of community experiences with racial bias in institutions and interpersonal relations (Whaley, 2001). It is plausible that feelings of cultural mistrust would decrease an African American's confidence that a report of racial harassment would be met with positive action. In addition, research in laboratory settings has found that African Americans are often hesitant to openly report that racial discrimination is the cause of negative experiences, even when they are certain that it is to blame, and that African Americans are less likely to publicly report experiencing discrimination due to sensitivity to the social costs of doing so (e.g., being branded as a trouble-maker; Stangor, Swim, Allen, & Sechrist, 2002). Furthermore, research demonstrates that people who do speak out in work settings are often subject to retaliation enacted through social isolation (Cortina & Magley, 2013). Taken together, this research indicates that members of vulnerable groups have high rates of distrust for institutions, that they are more likely to experience retaliation when they report racial harassment, and that as a result they are generally unlikely to report experiences of discrimination and harassment due to sensitivity to and fear of retaliation.

Nearly five decades of research on racial attitudes has consistently found that White and Black Americans differ in their attitudes on a variety of issues related to race including perceptions of the existence and consequences of racial discrimination (Bobo, Charles, Krysan, & Simmons, 2012). Laboratory researchers have found that Whites perceive incidents of racial harassment, including blatant threats and intimidating acts of vandalism, as less severe than African Americans and Hispanics (Chrobot-Mason & Hepworth, 2005). If African Americans and other racial minorities see themselves as victims of racial discrimination it is often believed that they bring it on themselves or are making a bigger issue of things then they should. The end result is that when it comes to racial discrimination in American society, most Americans

"naturally" gravitate to the role of bystander and do little (Bryant-Davis & Ocampo, 2005; Rosado, 1998).

Taken together, this research suggests that White and Black Americans hold widely divergent perceptions of the influence of racism on daily life and that their perceptions of social and political issues related to race may be influenced by negative racial attitudes towards Blacks. Research suggests that these divergent perceptions influence assessments of the severity of incidents of racial discrimination and racial harassment. As such, it seems possible that, given their divergent experiences with race and racial discrimination, the White staff could have been predisposed to view claims of racial discrimination as not compelling, important, or believable. Thus, Ms. Williams' claim could have been dismissed.

## Harmful Impact of Racial Discrimination

**The claim that Ms. Williams was emotionally and psychologically harmed by the events at Beaumont hospital is possible, as reflected by decades of empirical research that has provided strong scientific evidence that racism is experienced as a stressor that has a negative impact on the mental health of those targeted.**

The preponderance of the empirical research on racism provides strong evidence that racial discrimination has a negative, often severe impact on its targets  Analysis of research on racism provides further support for my opinions on this case. Extensive empirical research documents the continued occurrence of racial discrimination and harassment in the United States. The findings of research studies show how individuals are psychologically and emotionally harmed by racial discrimination and racism (e.g., Carter, Lau, Johnson, & Kirkinis, 2017; Carter, Johnson, et al., 2019). Research on racism has shown that many Americans continue to experience racial discrimination in various areas of life (e.g., housing, school, work) and that they see racism as a major problem in this country despite laws that prohibit such discrimination. One report notes that in 2017, 80% of Blacks thought racism was a major issue, twice as many who said that eight years earlier, and 52% of Whites shared this view, an increase of some 30% from eight years prior (Bialik, 2018). Discrimination, experienced by all racial groups, continues to be a prominent and critically important matter in American life, as it has been throughout American history (see survey results from previous sections)

Researchers have found that racial discrimination is prevalent across many domains, particularly for African Americans in the workplace, with high prevalence rates for racial minorities. Researchers have found that racial discrimination by employers has been and remains common, and that claims and charges of racial harassment by employers are consistently high over the last two decades (EEOC, 2018D). Various studies conducted with racially diverse samples (Whites and people of color, but mostly African Americans) have found that the incidence and prevalence of racial discrimination tends to be high for people of color and that exposure to such incidents of racism is associated with lower levels of health and psychological well-being. The American Psychological Association's (2016) study on discrimination and stress found that about 70% of people, irrespective of race, report experiencing discrimination every day (e.g., poor service, disrespect), and close to 50% report major discrimination encounters (e.g., unfair treatment in health care). Racial minorities of all groups report significantly higher levels of everyday discrimination compared to Whites. The American Psychological Association report notes that "regardless of the cause, experiencing discrimination is associated with higher reported stress and poorer reported health" (p. 8). Moreover, a review of lawsuits brought by Blacks and other minorities and employees suggests that actions similar to those alleged in this case have been the basis of litigation, by others.

**It is my opinion that Ms. Williams has considerable knowledge about race with which to recognize her racial encounters as racial discrimination and a racially hostile work environment. She contends that the events that occurred were out of her control, unpredictable, and emotionally painful. She also tried to cope with the situation to reduce the stress. She stated that her efforts to complain were in vain and that her complaints were met with silence, inaction, and were dismissed.**

Researchers have found associations between racism and a variety of indices of negative mental health, and statistical meta-analysis of large bodies of studies also found significant associations between exposure to racism and clinical symptoms (i.e., depression and anxiety) (Carter, Johnson, et al. 2019; Carter & Pieterse, 2020). Despite this evidence, the mental health impact of exposure to racial discrimination or harassment is not specifically considered in psychiatric diagnostic manuals. Based on examination of the extensive empirical evidence, I argue that psychological reactions to stressful and traumatic experiences with racism are a type

of race-based traumatic injury that is expressed in symptom clusters (Carter, et al, 2013; Carter & Pieterse, 2020).

Research on stress indicates that the intensity of the impact of stress is influenced by a person's ability to effectively cope with the stressor. When the stress of an event overrides one's ability to cope, deleterious health and mental health consequences can and often do occur. Furthermore, researchers have found that both the nature of the stressor and characteristics of the person are factors that might increase the psychological impact of a given event by depleting the resources available to cope. Researchers indicate that when people have difficulty coping effectively with racism, that this makes them vulnerable to increased psychological impact. The psychological harm reported in this case is consistent with the extensive literature on the psychological impact of racial discrimination and harassment as a stressor (Carter, et al, 2019).

## ASSESSMENT INTERVIEW FOR RACE-BASED TRAUMATIC STRESS INJURY

Background Information

Teoka Williams, is a 46-year-old Black middle class married woman with three children. Her husband is a 51-year-old Black self-employed middle-class man. Ms. Williams was raised in Detroit, Michigan by her mother and father. She is the youngest of seven children. She has three brothers and three sisters. Her father worked in the auto industry and her mother was a stay at home mother and at times worked as a custodian for the Board of Education. Her mother passed away in 1994 when she was 21 and her father currently lives with her.

Ms. Williams attended public schools in Detroit from kindergarten to high school. She attended George Ford Elementary School, Brooks Middle School, and Cooley High School before leaving school around the tenth grade to work full time. During her school years she had no trouble, no disciplinary problems, and describes herself as quiet, respectful, and cooperative. She maintained a B/C average with some A's, but would get C's in gym, as she reports she was indifferent to gym. She dropped out because she was bored and not interested in school activities, and felt she had no common ground with her peers. There was rarely violence in her schools, and her educational years were overall positive experiences. She had nice teachers in school, and she took their gifts and appreciated their interest in her. She believed she had good and trusted teachers, in fact she still communicates with some of them today. She believed that she was not getting a good education in high school like she did in middle and elementary

28

school. She believed that her learning experiences were of a poor quality in high school. She knew she had to finish high school and this was always her intention. However, she did leave school when she was 17 and did not get her GED until she was about 20 years old or so. She took GED classes for a while and then took the exam and passed.

She reports no health issues while in school, she stated she "never got sick". She became pregnant with her first child, a son, and because of an underdeveloped cervix, he was born premature, but he survived and has some developmental issues today.

There was an incident in her youth that is important: when she was 9-10 years old, her one-year old niece died from SIDS, and while this was sad and troubling, it also was a source of inspiration for her to pursue medicine and become a healthcare provider. This goal was a passion for her. Her family and parents helped her to cope with the loss by her niece by telling her that babies go to heaven. Her mother was religious (Pentecostal) and would pray on a regular basis. Her godparents were pastors and close friends of her parents and the family. While church was not a regular activity (her mother went 2-3 Sundays a month), religious beliefs were an important part of her socialization and social life.

She also recalls being taught to be an independent person and to avoid the pitfalls of the streets such as drugs and alcohol. She observed her oldest brother became consumed by drug and alcohol addiction. From this family issues, she directly learned the pain, damage, and harmful effects of drug use. Her brother still abuses substances, so she stays away from him and people who use substances, and rarely drinks herself (until recently since the incidents at the hospital, when she has been observed to drink a bit more frequently but only sometimes).

To complete her education, she entered a GED program at Wayne County Community College that allowed her to take college classes. Her participation was off and on, but she eventually completed the GED and earned some college credits in addition. As mentioned, she knew from a young age that she wanted to be a nurse, so she took measured steps to qualify for her nursing degree. She took classes that were pre-requisites for related programs, such as, one to become an emergency medical technician (EMT). So again, while studying for her GED, she also took classes to qualify for the position and certification to be a basic EMT and later a Paramedic. When she completed the GED program she was able to apply for her EMT license. The EMT credential helped her enter a Paramedic program that also led to her nursing degree. it took about 3-4 years before she could enter the certificate program to be a Paramedic. Around

her late 20's, she had her second child while married to Derek Shepard. They were together for 10 years, and then she reconnected with Kemuel Jeffers her high school sweetheart and they resumed their relationship and married in 2005 and are still married.

Her education continued after entering the Paramedic certificate program, which she completed, and she earned her associate degree in Liberal Arts. She took and passed the National Registry Exam for Paramedics in 2003 or 2004. She found a transitional program which allowed her to combined her training to be a paramedic with a path to being a registered nurse as well. In one year, she completed the program and graduated with honors, obtaining an associate degree in Science. Then she took the national exam for her nursing license and passed it. Since then she has taken classes for her B.A. in Business Administration at the University of Phoenix.

Work History

Before she left high school, Ms. Williams worked as an aid part-time (2 days per week for a few hours) at a group home for brain trauma patients, a position she held until she was about 18. Then she took a full-time position as a direct care worker in another group home, called Mansfield Homes for developmentally disabled people. She helped care for the six people in the home for about two years. Then she was hired as a job coach for the same type of clients. The job entailed assisting her clients at their jobs to meet their job duties. She went to work with her clients and assisted them, when and if, she was needed. She held this job for two or three years.

By this time, she had received her EMT credentials and was hired at Sinai Grace Hospital as a basic Emergency Medical Technician under the direct supervision of the medical staff. She held this position for some nine years between 1998-2007, and while there she became a Paramedic (2003). During these working years she had no significant medical issues, or mental health issues.

She left Sinai Grace to join the Detroit Fire Department as an EMT and later, when a post opened, as a Paramedic. While at Sinai Grace working full-time, she worked at both jobs for a time, then moved to the Fire Department, but had to wait for an opening as a Paramedic. She also worked as a home aid (1990-2000), while full-time at the hospital. During this period, she was in nursing school (2007). When she completed her nursing education she was hired at Oakwood Hospital, which became Beaumont Hospital (2008). While employed at Beaumont, Ms. Williams was a member of the IV team, she developed the needed skills to establish an IV, and would be

called to do so when needed. While working at Beaumont she also did part time contingency work as a critical care nurse for Friends Who Care at Henry Ford Hospital for two years. In May 2019, she was terminated from her job at Beaumont for HIPAA violations.

While at Beaumont she developed some health issues. She had headaches, depression, and anxiety that her doctor diagnosed as being brought on by a benign pituitary tumor (brain tumor). She was given medication for her symptoms of anxiety and depression as well as the tumor but was unable to tolerate the tumor medication and stopped taking it. She consulted with a specialist about her condition.

<u>Racial Experiences</u>

During her early years Ms. Williams had no racial experiences that stood out to her. She attended schools that were mostly Black but also had students from other racial groups (White, Asian). There were no race-related incidents or issues. Her high school was more diverse in that it was 75% Black and 25% White, but again she reported no issues that stood out.

He mother taught her about race and about her own racial experiences from when she lived in Alabama. Her mother described racism and how she (her mother) was treated. Her mother talked about various incidents with racial discrimination she had and how she would be addressed by the "n-word" and how she found that disheartening.  He fathers relayed stories about working in plants and how blacks were suspended and treated unfairly. He talked about how much harder managers and supervisors were on Blacks and about how he had to deal with it so he could provide or his family.

Ms. Williams also learned about preferential treatment given to Whites through things she read and through direct experiences. For instance, while in nursing school she saw that Blacks and Whites were treated differently. She recalled one incident when a White student plagiarized her paper and she reported it and nothing was done. She took from these experiences that Blacks needed to do more to be considered good enough and to be able to succeed.  She thought that it was best to go ahead and not use race as an excuse for anything that did not go well.

While at the Fire Department working as an EMT/Paramedic she arrived at an accident scene and observed that a White man was bleeding from a head wound and as she approached to assist he told the doctor caring for him that, he did not want "no N-word" to help him, and for

her not to touch him. She was told not to provide aid. All that was done was that her partner (a White male) wrote up the incident, but no action followed. She was embarrassed and shocked.

With respect to race and racial dynamics she also observed within group racial dynamics, among blacks, wherein lighter skin Blacks were favored over darker ones. She observed that guys preferred lighter women. She was preferred, if no one was lighter than her, and she understood this behavior to be confusing, but as she got older she thought of this in terms of the effects of segregation and racial discrimination.

When she attended college, she learned more about race and racism from her Black professors who taught about American history. She learned that how people were understood was related to race. For instance, in communicating, if a White person was upset it would be taken as that only, but if a Black person was upset it would be attributed to them being angry, dangerous, and threatening. While Black behavior was seen as more negative. She realized that Blacks are stereotyped as poor or not ambitious. She thinks that Blacks need to offer excuses and explanations for their life experiences, like young women getting pregnant, because it is seen as terrible if the woman is Black, yet not so for Whites.

While employed at Beaumont she observed Whites being able to behave more freely with fewer restrictions and few penalties for their self-expression. Blacks on the other hand had to adhere to different standards. She worked on various floors in the hospital, and observed, other nurses behaved in ways that were lacking but not addressed by leadership. She noticed also that Black patients would be treated differently they would be treated with less respect and that White nurses were more responsive to White patients.

Ms. Williams views herself as Black, which means unequal, often not good enough, and that many of her life achievement are not acknowledged. At the same time, she feels that she is not responsible for what people think.


Summary of Incidents at Beaumont Hospital (see deposition testimony for full details)

Ms. Williams began working for Beaumont Hospital in Dearborn, Michigan in or around July of 2008 as a registered nurse. Before assuming her duties, she was required to attend orientation and training sessions for three weeks in which policies and procedures were presented and reviewed with all new employees. The training covered how to treat patients with dignity and respect, and how to deal with verbally and physically aggressive and threatening

patients. The training emphasized the need to be professional, to remain calm, be direct, and to call security and ones' supervisor. Training also included how to evacuate and maintain patient safety in the event of storms, disasters, and related events. <u>The training was held yearly and often included information about the hospitals' anti-discrimination policies as they pertained to employees but not about patients.</u>

On or about November 1st/ 2nd , 2017, she was assigned to work the midnight shift (11:30pm – 8am) on 8 North. On this floor patients usually stay for 3-5 days, and most patients can move around with assistance, however, many require aid since there is a large risk of falling. Patients often range in age from 50-80 and are also for the most part, with some variation, coherent and have good cognitive functioning. Some patients are being treated for renal conditions and related matters.

She was assigned 6-7 patients to care for during that shift and two patients were in room 881. She went into room 881 to the patients since nurses need to evaluate their assigned patients on a regular basis (hourly). In her first interaction with one of the patients in 881 she was asked if she was going to be her nurse (Williams, depo., p. 35). An incident occurred that night when the bed alarm sounded and Ms. Williams and the nursing assistant responded to find the patient in 881-2 getting up to go to the bathroom. Ms. Williams found that the patient was tangled in her bedsheets and was at risk for falling. To prevent harm to the patient she firmly grabbed her arm to steady her and the patient's response was to yell "do not touch me", and yet she allowed the nursing assistant (who was White) to touch her. After she helped the patient in 881-2, as she left she overheard the patient say she did not want that "Black bitch" taking care of her and that she wanted a different nurse and asked to speak with the nurse in charge.

Upon receiving the patient's request, to speak to the charge nurse, Ms. Williams went to the charge nurse, Crystal Kopriva, and told her what occurred, and she encouraged Crystal to advise the patient that race was not a reason for a change in the nursing assignment. Crystal talked to the patient who told her she did not want that nurse or "that Black lady" and "I want a different nurse, I don't want a Black nurse" caring for her (according to the Williams, depo, p. 52-52 and Shakina Kalondo, nursing assistant who was also outside the room, depo, p. 8-9). Crystal told the patient she was going to remove Ms. Williams and that the patient would not have to see her anymore. This happened around 5 am and there were three or more hours remaining to Ms. Williams shift. Ms. Williams tried to assure the charge nurse that she was

capable of providing the needed care to the patient regardless of the patient's wish not to have her as her nurse, and that to act otherwise was unwarranted, unprofessional, and maybe illegal.

The patient was overheard saying she did not want a Black nurse and that they should not have assigned a Black nurse to her (Williams depo, p. 45), by Ms. Williams and others, since Ms. Williams was right outside the room visible to the patient, and able to hear easily because the door was open, the patient was in close proximity and she was speaking very loudly (Williams depo p. 46-48). Crystal denies that the patient stated this racial preference to her, she says the patient stated she did not like Ms. Williams' attitude and that she (the patient) did not say anything about the nurse being Black. Yet the charge nurse acknowledged that not liking a nurse's attitude was not a valid reason to remove a nurse (Crystal Kopriva, depo., p. 30-31).

It is Ms. Williams' contention that the rationale for the patient's request to change nurses was not legitimate and thus should not have been acted upon (Williams depo., p. 50). The charge nurse Crystal then told Ms. Williams she was not to go in room 881 and if the patient needed care, Olivia (a White nurse) would go in the room instead. Ms. Williams was told directly that the change would not involve her giving the new assigned nurse (Olivia) for 881-2 a patient report. In fact, the charge nurse told Ms. Williams not to give a report to the new nurse caring for the patient. Crystal, the charge nurse, declined to have a report to transfer the patient to another nurse, for the last 3 hours of an 8-hour shift. During the remainder of Ms. Williams shift there were times the patients in room 881 needed care while she was unofficially barred from providing them care based solely on her race, it is alleged. To add to this action, the nurse, Olivia, who was unofficially assigned by the charge nurse to care for the patients in the room (881), asked Ms. Williams to get items requested by the patients during the time period she was unofficially barred from the room.

During each shift, nurses are required to produce an hourly "Rounding Assessment" for each patient they are assigned to care for. To do this the nurse needs to go into the room and assess the patients' status and needs, such as medications, comfort, and related things. The rounding assessments are documented with forms prepared by the assigned nurse. That night, Olivia asked that she (Ms. Williams) sign the rounding sheet for the full shift, not just the time she cared for patients.

Ms. Williams complained to human resources right after her shift when she encountered Ms. Fildew, an HR manager, while she was leaving and told her in brief what happened. Ms.

Fildew asked Ms. Williams to write an email to her (the HR rep) about the alleged race discrimination. At the time of this encounter, Ms. Williams was extremely upset and thus was not able to fully convey all that just took place.

Ms. Williams discussed the incident of November 1 and 2, 2017 with human resources (HR) staff at a previously arranged meeting on November 8, 2017. Scheduling and other issues that were brought to HR before the November 2nd incident were also discussed.

Ms. Williams claims she was told at the meeting with HR staff that patients' requests are honored all the time and the next time it happened she would simply be taken off the assignment altogether. Ms. Williams alleges that at the meeting with HR she was "shut down". Ms. Ward (who was the nurse in charge of 8 North and was Crystal's, the assistant managers' superior) indicated that the racial request was "no different than a Middle Eastern female asking not to have a male nurse". It is alleged that no apology was given to her for the incident and the actions taken against her. Ms. Williams states that her treatment at the HR meeting and before was "malicious, and unethical" (depo, p. 191), and potentially illegal.

Ms. Ward was to have investigated the incident. Actually Ms. Ward only spoke to two people Crystal and Olivia and later a third person, yet no official documentation of said investigation was revealed or made available (Ward depo., p. 34-37). Ms. Williams felt harassed, humiliated and discriminated against because she was unable to complete her job duties and was unable to perform her job responsibilities because of her race.

It is the series of events that are at issue for Ms. Williams, not the specific comment by the patient alone ("she did not want a Black nurse or that "Black bitch" to care for her – a statement by the patient that was also heard by Ms. Kalondo). At issues for Ms. Williams are the totality of events that are connected to her allegation of racial discrimination and emotional distress she has endured. **The actions and inactions, that is the honoring of the patient's request and subsequent dismissal of Ms. Williams' complaints, are the source of her feeling demeaned, ignored, humiliated, and disrespected.**

Ms. Williams' statements in the current case make clear that she thought she was being subjected to a racially hostile environment in which she was treated in a demeaning and dismissive manner due to her race. She further believes that she was the target of subsequent racial harassment and intimidation by her co-workers, hospital leaders, and human resource staff. In addition, she attempted to report the racially-based behavior of the patient to the charge nurse

35

and after that the actions taken by the charge nurse to her superiors and to lodge a complaint with human resources and no action was taken regarding her concerns.

Ms. Williams' racial allegations were documented and were corroborated. Nevertheless, there were people in positions of authority who did not act to address her concerns pertaining to the patient's request, the fact that she was unofficially removed from caring for a patient based on her race, and that the nurse in charge acted unofficially on the patient's request, leaving Ms. Williams legally and professionally responsible for patients she was told directly by the charge nurse not to provide nursing care to and not to enter the room to personally assess.

The hospital staff and nurses who were in charge have different racial backgrounds than Ms. Williams and as such, they may have had different perceptions regarding the significance attributed to the initial request for a different nurse by the patient and the charge nurse's actions.

Ms. Williams claims to have suffered emotional distress and mental anguish injuries, as well as feelings of extreme embarrassment and humiliation, and damage to her professional reputation. Ms. Williams' claims of mental anguish and emotional distress are corroborated by her primary care physician and the psychologist who treated her after the 2017 incidents for migraine headaches, high blood pressure, work-related anxiety, obesity, and depression. She was treated by the psychologist for depression, anxiety, and stress that resulted from her experience at the hospital.

It is important to note that the original basis for her headaches was a brain tumor but in time the location of her headaches shifted from the back of her head to the front, suggesting that stress was a major element in the headaches. In fact, according to her neurologist, the headaches now were also stress related.

In August of 2018, Ms. Williams started seeing Dr. Marsh a psychologist because she was having trouble sleeping and was depressed, and she was referred to Dr. Bonds, a psychiatrist, for a medication referral. She was diagnosed as having generalized anxiety disorder and was prescribed Xanax. She sought the mental health referral because she was increasingly angry and anxious, and she was keeping things inside, and was disconnected from what happened. Her ability to cope was not healthy, she was ruminating about the incident, and she was withdrawn.

She saw Dr. Marsh for once a week sessions for some 18-20 weeks so that she could figure out what to do regarding her feelings of brokenness, discouragement, and lost confidence.

36

She worked on acceptance, and tried to learn coping skills, to address what occurred. She did not want the incident to control her life. However, while the therapy was helpful and aided in her healing, it did not address the racial component of the incident, and as such left her with open emotional wounds.

## COLLABORATIVE INTERVIEW AND DEPOSITION TESTIMONY

On September 29th and 30th, 2019 I meet with Kamil Pitts, Ms. Williams' 30-year-old, African American, working class, niece.  She relayed some of Ms. Williams' history such as where she went to school and some work positions Ms. Williams' held. She described her aunt as like a second mother to her. She reported that she talked with her about most things in her life and that they talked daily, and are close. Before the incidents, her aunt was a confident, health and fitness-oriented person who worked out every other day either at a gym or her home gym to stay fit, a goal that was extremely important to her aunt. Before the incident she describes Ms. Williams as easy going and dedicated to her profession. She exhibited a lot of energy and was very active at home and work, and members of the family looked to her for guidance and consultation.

During and after the events at the hospital her aunt became sad and withdrawn. She stated that her aunt was upset by her experiences at work. She said her aunt knew about racism but did not expect to experience it directly. Since the incidents at the hospital her aunt does not socialize and has been secluded. What stands out is her aunt's weight gain and low energy. Her aunt was always proud to be a nurse and now that has changed. She seems to not want to be a nurse anymore. She now talks about changing careers.

Physician's Testimony

Ms. Williams was treated for depressed mood, anxiety, and was given medications for her symptoms some time in 2016. In that same year these medications were discontinued. Dr. Bhardwaj noted that in July 2016 she was found to have pituitary adenoma which caused her headaches and limited her ability to work. In January 2018, she reported anxiety and depressed mood and Dr. Bhardwaj attributed these symptoms to her medical condition (Bhardwaj, depo, p. 22). He notes that in September 2018 she reported that her headaches were getting worse due to workplace harassment (depo, p, 30, 32, 37). The Dr. reports that Ms. Williams said she was being harassed at work by being disrespected by her managers and other people were unfriendly

toward her (depo, p. 47-48). He also confirms her problems with sleeping and prescribed Ambien (depo, p. 50). On September 24, 2018 anxiety was indicated in her medical records. The Dr. indicated that her headaches and anxiety could be made worse by stress (depo., p. 57).

Psychologist Testimony

Dr. Marsh began to see Ms. Williams around the 28th of October, 2018. He states that she presented with "low motivation, a sense of helplessness, ... difficulties with sleep and energy, ... the general criteria of a major depressive disorder" (Marsh, depo, p. 27).  She also had " .. [feelings of] anxiety, feeling anxious, worrying a lot, questioning herself" (depo, p. 28).  Dr. Marsh, also spoke about Ms. Williams being overwhelmed by events. He pointed out that a significant element that was involved in her distress was the fact that she took a great deal of pride in the fact that she had overcome considerable obstacles to achieve her lifelong ambition of being a nurse or medical professional and that she did so on her own (depo, 28-30). She mentioned that an element of her distress was directly related to "her professional experience (depo, p. 31)". "There also became a theme of facing discrimination periodically throughout her life in the workplace at EMS as well as the current concern" (depo, p. 31). Marsh noted that they recognized that her major depression was in response to workplace discrimination (depo, p. 31). He also noted that she talked about going to human resources and having her compared to a Muslim woman. She also talked about, "her on-going concerns about harassment in the workplace between the supervisor and herself as well as her other co-workers... " (depo, p.35). In response to a question about how the incidents at the hospital impacted her, Dr. Marsh stated "The symptoms she came in with, the major depression episode that she presented with and still struggles with, in different ways, but it (she) would be questioning her own competence, questioning her ability to do the work she has been doing and cares about, it would be thoughts of helplessness and feelings of helplessness, . . . when these thoughts are persistent and she's ruminating on them . . . it's interfering with her sleep and contributing to her anxiety" (depo, p. 37).  She talked about feeling alone and that it was hard to have her husband's support without him experiencing the situation. "I think this is a common response to distress" (depo, p. 38). It was hard to be present and she felt disconnected and withdrawn from her family, Dr. Marsh noted.

## ASSESSMENT FINDINGS: EMOTIONAL AND PSYCHOLOGICAL IMPACT OF EVENTS AT BEAUMONT HOSPITAL

Ms. Williams states that she was demeaned, humiliated, and made to feel powerless by being unofficially removed from her nursing duties as the legal and professional person responsible for the assigned patients on her work shift. She indicated that she felt like a child who was betrayed by the hospital and treated in a way that she did not think was justified or warranted, and that was because of her race. She contends that the stated reason given by the patient who made the request that she be removed from her care was racial and not related to her having a bad attitude. She felt and continues to feel frustrated, stressed, angry, enraged, irritable and she has trouble sleeping. Since the event occurred she has been withdrawn, for instance she would phone, text, and visit family and friends daily or weekly, and now she describes herself as having gone into a shell. She is withdrawn from everyone including her friends who were nurses. In essence she has stopped interacting altogether. She is not herself since she lost her confidence and her voice, and now feels inadequate and hurt by the lack of action of the HR department and nursing managers. She has had difficulty being intimate with her husband since the events. She and her husband were close or intimate 4-5 times a week and since once every 6-8 weeks. She noticed that when she talks about the incident her hands sweat and she shakes and her heart races. Before the incidents she was active and easy going, and since she has lost motivation and feels anxious all the time and is afraid of being rejected and disregarded. Her symptoms are corroborated by her primary care physician, the psychologist she went to for help, and her niece.

When people experience stress and/or race-based trauma their symptoms can be manifested in various ways that are determined by their personality and life experiences. It seems clear that Ms. Williams, stress and race-based stress/trauma are expressed through depression and anxiety. As part of my interview with her she completed the Race-Based Traumatic Stress Symptom Scale (RBTSSS, Carter et al, 2013) and I integrated her responses to its items into my clinical interview with her and did not use it as a survey measure (did not use it's scoring). Nevertheless, the scale in which she had the highest raw score was depression, which is consistent with her behavior and symptoms across the various helping professionals she has seen.

She exhibits all the criteria for the presence of race-based traumatic stress injury. She has intrusive thoughts, is hyperaroused (on edge), engages in avoidance behavior, is emotionally unavailable, withdrawn (emotionally numb), has significant disruptions in her personal, intimate, and social life, is enraged, has physical reactions (sweating hands, racing heart, etc.,) and her self-esteem has been badly damaged.

Furthermore, Ms. Williams has personal knowledge and experiences with race sufficient to assess and recognize her encounters, at the hospital, as being based on her race and thus to recognize it as racial discrimination and a racially hostile work environment. Her racial experiences at Beaumont Hospital were beyond her control, unexpected and emotionally painful.

When the events unfolded she immediately tried to cope with the stress of the situation, by objecting directly, and in the moment, to the charge nurse's actions and decision. More important, she indicated that she was able to care for the patient as a professional nurse would be expected to do. Therefore, she argued that she should not be removed (officially or unofficially) from caring for the patient. She also lodged a complaint with HR. None of her efforts to adapt and cope with the racial discrimination she alleges were successful.

**Ms. Williams exhibits signs and symptoms of race-based traumatic stress injury.** Her primary symptoms are depression and anxiety, and her other reactions are combined with these core symptoms. She is and has been depressed (lacks energy and is tired all the time), feels angry, and reports intrusive thoughts in which she ruminates about what occurred, and this tends to deepen her depression. She engages in avoidance behavior and shows signs of physical reactions (rapid heart rate, high blood pressure, etc.). She reported experiencing significant anxiety after the events in question at Beaumont Hospital. She also has problems sleeping, reports decreased intimacy in her marriage, and she avoids family and friends. She notes that she has flashbacks from the harassment she endured. In her interview she noted that her reactions were observed and experienced by others.

**I believe that Ms. Williams' experiences at Beaumont Hospital are the proximate cause of her psychological and emotional injury she has and continues to suffer. I believe further, that the degree of the race-related traumatic stress injury and associated symptoms have caused clinically significant distress and impairment that persist today, and I concur with the other health professionals she saw. I may have additional opinions and reasoning if I review any additional material.**

Respectfully

Robert T Carter, Ph.D.

## REFERENCE LIST

2018 National Healthcare Quality and Disparities Report. Content last reviewed September 2019. Agency for Healthcare Research and Quality, Rockville, MD. https://www.ahrq.gov/research/findings/nhqrdr/nhqdr18/index.html

American Medical News (March 4, 2013). Drawing the line on racially motivated patient demands. Retrieved on September 27, 2019 from https://amednews.com/article/20130304/profession/130309980/7/

American Psychiatric Association (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.) Text Revision. Washington, DC: American Psychiatric Association.

American Psychological Association (2016). *Stress in America: the impact of discrimination.* Stress in America Survey.

Bialik, K. (2018, February 22). 5 facts about blacks in the US. *Pew Research Center.* Retrieved from www.pewresearch.org

Banks, K.H., Kohn-Wood, L. P., & Spencer, M. (2006). An examination of the African American experience of everyday discrimination and symptoms of psychological distress. *Community Mental Health Journal, 42(*6), 555-570.

Beaumont Health (n.d.) *Patient Rights and Responsibilities.* Retrieved on September 18, 2019 from https://www.beaumont.org/patients-families/patient-rights

Benjamins, M. R., & Whitman, S. (2014). Relationships between discrimination in heath care and health care outcomes among four race/ethnic groups. *Journal of Behavioral Medicine, 37*(3), 402-413. doi: https://doi.org/10.1007/s10865-013-9496-7

Bennett, G.G., Wolin, K.Y., Robinson, E.L., Fowler, S., & Edwards, C. (2005). Perceived racial/ethnic harassment and tobacco use among African American young adults. *American Journal of Public Health, 95*(2), 238–40.

Barnett, R. C., Marshall, N. L., & Sayer, A. (1997). The changing workforce, job stress, and psychological distress. *Journal of Occupational Health Psychology, 2*(2), 99–107.

Black, L. L., Johnson, R., & VanHoose, L. (2015). The relationship between perceived racism/discrimination and health among Black American women: A review of the literature from 2003–2013. *Journal of Racial Ethnic Health Disparities, 2*(1), 11–20. doi:10.1007%2Fs40615-014-0043-1.

41

Bobo, L, D. (1999). Prejudice as group position: Micro-foundations of a sociological approach to racism and race relations. *Journal of Social Issues*, 55(3), 445-472.

Bobo, L.D., Charles, C.Z., Krysan, M. & Simmons, A.D. (2012). The *real* record on racial attitudes. In Peter V. Marsden (Ed.), *Social trends in American life: Findings from the General Social Survey since 1972*. Princeton, NJ: Princeton University Press.

Borrell, L., Jacobs, D., Williams, D., Pletcher, M., Houston, T., & Kiefe, K., (2007). Self-reported Racial Discrimination and Substance Use in the Coronary Artery Risk Development in Adults Study. *American Journal of Epidemiology, 166*, 1068-1079.

Borrell, L. N., Kiefe, C. I., Diez-Roux, A. V., Williams, D. R., & Gordon-Larsen, P. (2013). Racial discrimination, racial/ethnic segregation and health behaviors in the CARDIA study. *Ethnicity and Health, 18*(3), 227-243. doi: 10.1080/13557858.2012.713092

Brady, J.M. (2014). The racist patients - revisited. *Journal of perianesthesia nursing*, 29(3), 239-241.

Brief, A. and Barsky, A. (2000), "Establishing a climate for diversity: The inhibition of prejudiced reactions in the workplace", *Research in Personnel and Human Resources Management* (*Research in Personnel and Human Resources Management, Vol. 19*), Emerald Group Publishing Limited, Bingley, pp. 91-129. https://doi.org/10.1016/S0742-7301(00)19004-8

Britt-Spells, A. M., Slebodnik, M., Sands, L. P., & Rollock, D. (2016). Effects of perceived discrimination on depressive symptoms among Black men residing in the United States a meta-analysis. *American Journal of Men's Health*. doi:10.1177%2F1557988315624509.

Broman, C. L., Mavaddat, R., & Hsu, S. (2000). The experience and consequences of perceived racial discrimination. *Journal of Black Psychology, 26(2),* 165-180.

Brondolo, E., Brady ver Halen, N., Pencille, M., Beatty, D., & Contrada, R. J. (2009). Coping with racism: a selective review of the literature and a theoretical and methodological critique. *Journal of Behavioral Medicine,* 32, 64-88.

Brondolo, E., Ver Halen, N. B., Libby, D., & Pencille, M. (2011). Racism as a psychosocial stressor. In R. J. Contrada & A. Baum (Eds.), *Handbook of stress science: Biology, psychology, and health* (167–184). New York: Springer.

Brondolo, E., Brady, N., Thompson, S., Tobin, J. N., Cassells, A., Sweeney, M., et al., (2008). Perceived racism and negative affect: Analyses of trait and state measures of affect in a community sample. *Journal of Social and Clinical Psychology, 27(*2), 150– 173.

Brondolo, E., Rieppi, R., Erickson, S. A., Bagiella, E., Shapiro, P. A., McKinley, P., et al. (2003). Hostility, interpersonal interactions, and ambulatory blood pressure. Psychosomatic Medicine, 65,1003–1011.

Bryant-Davis, T. & Ocampo, C. (2005).  Racist-incident-based trauma. *The Counseling Psychologist, 33(4), 479-500.*

Carlson, E. B. (1997). *Trauma assessments: Clinician's guide*. New York: Guilford.

Carter, R. T. (1995). *Race and Racial Identity in psychotherapy: toward a racially inclusive model*. New York, NY: John Wiley & Sons.

Carter, R. T. (2005). Uprooting inequity and disparities in counseling and psychology: An Introduction. In R. T. Carter (Ed.), *Handbook of racial-cultural counseling and psychology: Theory and research* (Vol. 1) (pp. xv-xxviii). New York, NY: Wiley.

Carter, R.T. (2007). Racism and psychological and emotional injury: Recognizing and assessing race-based traumatic stress. *The Counseling Psychologist*, *35(1),* 1-93.

Carter, R.T. & Forsyth, J.M. (2009). A guide to the forensic assessment of race-based traumatic stress reactions. *Journal of the American Academy of Psychiatry and the Law. 37(1),* 28-40.

Carter, R. T., Forsyth, J., Mazzula, S., & Williams, B., (2005). Racial discrimination and race-based traumatic stress. In R. T. Carter, (Ed.), *Handbook of racial-cultural psychology and counseling: Training and practice* (Vol. 2) (pp. 447-476). New York, NY: Wiley.

Carter, R. T., Forsyth, J., Williams, B. & Mazzula, S. (2007). Does racism predict psychological harm or injury: Mental health and legal Implications. *Law Enforcement Executive Forum*, 7(5), 129-154.

Carter, R.T., Muchow, C, &, Pieterse, A.L., (2018) Construct and predictive validity and measurement equivalence of the RBTSSS with Black Americans *Traumatology,24 (1), 8-16.*

Carter, R. T., Johnson, V., Kirkinis, K., Roberson, K., Muchow, C., & Galgay, C. (2019). A meta-analytic review of racial discrimination: Relationships to health and culture. *Race and Social Problems,11*(1), 15–32. doi:10.1007/s12552-018-9256-y.

Carter, R. T., Johnson, V. E., Muchow, C., Lyons, J., Forquer, E., & Galgay, C. (2016) Development of classes of racism measures for frequency and stress reactions: Relationships to race-based traumatic symptoms. *Traumatology, 22*(1): 63–74. http://dx.doi.org/10.1037/trm0000057

Carter, R. T., Lau, M. Y., Johnson, V., & Kirkinis, K. (2017). Racial discrimination and health outcomes among racial/ethnic minorities: A meta-analytic review. *Journal of Multicultural Counseling & Development, 45*(4), 232–259. doi:10.1002/jmcd.12076.

Carter, R. T., & Pieterse, A. (2020). *Measuring the effects of racism: Guidelines for the assessment and treatment of race-based traumatic stress injury.* New York, NY: Columbia University Press.

Chandola, T., & Marmot, M. G. (2011). Socioeconomic status and stress. In R. J. Contrada & A. Baum (Eds.), *Handbook of stress science: Biology, psychology and health* (pp. 185–195). New York: Springer.

Chaney v. Plainfield Healthcare Center (July 10, 2010). Retrieved on September 16, 2019 from https://caselaw.findlaw.com/us-7th-circuit/1532314.html

Chavez, L.J., Ornelas, I.J., Lyles, C.R., Williams, E.C. (2015). Racial/ethnic workplace discrimination: Association with tobacco and alcohol use. *America journal of preventive medicine*, 48(1), 42-49.

Chrobot-Mason, D. & Hepworth, W. (2005). Examining perceptions of ambiguous and unambiguous threats of racial harassment and managerial response strategies. *Journal of Applied Social Psychology*, 35, 2215-2261.

Contrada, R. J., Ashmore, R. D., Gary, M. L., Coups, E., Egeth, J. D., Sewell, A., Ewell, K., Goyal, T. M., & Chase, V. (2001). Measures of ethnicity-related stress: psychometric properties, ethnic group differences, and associations of well being. *Journal of Applied Psychology, 31*, 1775-1820.

Cortina, L.M. & Magley, V.J. (2003). Raising voice, risking retaliation: Events following interpersonal mistreatment in the workplace. *Journal of occupational health psychology* 8(4), 247-265.

Cottingham, M. D., Johnson, A. H., & Erickson, R. J. (2018). "I can never be too comfortable": Race, gender, and emotion at the hospital bedside. *Qualitative Health Research, 28*(1), 145-158. doi: 10.1177/1049732317737980

44

Deitch, E. A., Barsky, A., Butz, R. M., Chan, S., Brief, A. P., & Bradley, J. C. (2003). Subtle yet significant: The existence and impact of everyday racial discrimination in the workplace. *Human Relations*, *56*(11), 1299–1324. https://doi.org/10.1177/00187267035611002

Department of Justice. (2017). *About hate crime statistics, 2017 and recent developments*. Retrieved from https://ucr.fbi.gov/hate-crime/2017

Devine, P. G. (1989). Stereotypes and prejudice: Their automatic and controlled components. *Journal of Personality and Social Psychology*. 56(1), 5-18.

Din-Dzietham, R., Nembhard, W. N., Collins, R., & Davis, S. K., (2004). Perceived stress following race-based discrimination at work is associated with hypertension in African-Americans: The Metro Atlanta heart disease study, 1999-2001. *Social Science and Medicine*, *58*(3), 449-461. https://doi.org/10.1016/S0277-9536(03)00211-9

Dovidio, J. F., Gaertner, S. L., Kawakami, K., & Hodson, G. (2002). Why can't we just get along? Interpersonal biases and interracial distrust. *Cultural Diversity & Ethnic Minority Psychology, 8,* 88-102.

Dovidio, J. F., & Gaertner, S. L. (1996). Affirmative action, unintentional racial biases, and intergroup relations. *Journal of Social Issues, 52*(4), 51-75. Doi: https://doi.org/10.1111/j.1540-4560.1996.tb01848.x

Dovidio, J. F., & Gaertner, S. L., (2002). Color blind or just plain blind? The pernicious nature of contemporary racism. *The Non-Profit Quarterly*. 1-5.

Dovidio, J. F., Kawakami, K., Johnson, C., Johnson, B., & Howard, A. (1997). On the nature of prejudice: Automatic and controlled processes. *Journal of Experimental Social Psychology, 33*(5), 510-540. doi: https://doi.org/10.1006/jesp.1997.1331.

Dovidio, J. F., Gaertner, S. L., & Pearson, A. R. (2017). Aversive racism and contemporary bias. In C. G. Sibley & F. K. Barlow (Eds.), *The Cambridge handbook of the psychology of prejudice* (pp. 267-294). New York, NY, US: Cambridge University Press. http://dx.doi.org/10.1017/9781316161579.012

Dovidio, John, F. Angelika Love, Fabian, M.H. Schellhass, and Miles Hewstone. (2017). Reducing intergroup bias through intergroup contact: Twenty years of progress and future directions. *Group Processes & Intergroup Relations, 20, 5*, 606-620.

Earnshaw, V. A., Rosenthal, L., Carrol-Scott, A., Santilli, A., Gilstad-Hayden K., & Ickovics, J. R. (2016). Everyday discrimination and physical health: Exploring mental health

45

processes. *Journal of Health Psychology, 21*(10), 2218–2228.
doi:10.1177%2F1359105315572456.

Equal Employment Opportunity Commission (2016). Report of the co-chairs of the EEOC select task force on the study of harassment in the workplace. Retrieved on October 8, 2019 from https://www.eeoc.gov/eeoc/task_force/harassment/report.cfm

Equal Employment Opportunity Commission (2018A). Race-based charges (Charges filed with EEOC) FY 1997 Through FY 2018. Retrieved on October 2, 2019 from https://www.eeoc.gov/eeoc/statistics/enforcement/race.cfm

Equal Employment Opportunity Commission (2018B). Charges alleging race and harassment. (Charges filed with EEOC) FY 1997 Through FY 2018. Retrieved on October 2, 2019 from https://www.eeoc.gov/eeoc/statistics/enforcement/race_harassment.cfm

Equal Employment Opportunity Commission (2018C). Based by issue (charges filed with EEOC) FY 2010 - FY 2018. Retrieved on October 8, 2019 from

Equal Employment Opportunity Commission (2018D). Charge Statistics (Charges filed with EEOC) FY 1997 Through FY 2017. Retrieved on October 4, 2019 from https://www.eeoc.gov/eeoc/statistics/enforcement/charges.cfm

Essed, P. (1991). *Understanding Everyday Racism: An Interdisciplinary Theory*. Newbury Park, CA.: Sage Publications.

Feagin, J.R. & McKinney, K.D. (2003). *The Many Costs of Racism*. Lanham, MD: Rowman and Littlefield.

Feagin, J.R., & Sikes, M.P., (1994). *Living with Racism the Black middle-class experience.* Boston, M.A.: Beacon Press

Fekedulegn, D., Alterman, T., Charles, L.E., Kershaw, K.N., Safford, M.M., Howard, V.J., & MacDonald, L.A. (2019). Prevalence of workplace discrimination and mistreatment in a national sample of older U.S. workers: The REGARDS cohort study. *SSM - Population health*, 8(2019), 100444. https://doi.org/10.1016/j.ssmph.2019.100444

Forsyth, J.M. & Carter, R.T. (2012). The relationship between racial identity status attitudes, racism-related coping, and mental health among Black Americans. *Cultural diversity and ethnic minority psychology*, 18(2), 128-140.

Gee, G. C., Spencer, M., Chen, J., Yip, T., & Takeuchi, D. T. (2007). The association between self-reported racial discrimination and 12-month *DSM-IV* mental disorders among Asian Americans nationwide. *Social Science & Medicine, 64*(10), 1984–1996.

Graham, C.L., Phillips, S.M., Newman, S.D. & Atz, T.W. (2016). Baccalaureate minority nursing students perceived barriers and facilitators to clinical education practices: An Integrative review. *Nursing Education Perspectives*, *37*, 130–137. doi:10.1097/01.NEP.0000000000000003

Gronningsater, S. (2012). A patient's right to choose is not always black and white: Long term care facility discrimination and the color of care. *Journal of civil rights and economic development*, 26(2), 329-362.

Gunarantnam, Y. (2001). 'We mustn't judge people … but': Staff dilemmas in dealing with racial harassment amongst hospice service users. *Sociology of health & illness*, 23(1), 65-84.

Hagey, R., Choudhry, U., Guruge, S., Turrittin, J., Collins, E., & Lee, R. (2001). Immigrant nurses' experience of racism. Journal of Nursing Scholarship, 33(4), 389-394. https://doi.org/10.1111/j.1547-5069.2001.00389.x

Hall, J. M., & Fields, B. (2013). Continuing the conversation in nursing on race and racism. *Nursing Outlook, 61*, 164–173. doi:10.1016/j.outlook.2012.11.006

Hammond, W.P., Gillen, M. & Yen, I.H. (2010). Workplace discrimination and depressive symptoms: A study of multi-ethnic hospital employees. *Race and social problems*, 2, 19-30.

Harrell, J.P., Hall, S., & Taliaferro, J. (2003). Physiological responses to racism and discrimination: An assessment of the evidence. A*merican Journal of Public Health, 93(2),* 243-8.

Harrell, S.P. (2000). A multidimensional conceptualization of racism-related stress: Implications for the well-being of people of color. *American Journal of Orthopsychiatry*, 70 (1), 42-57.

Hoyle, R., Harris, M. & Judd, C. (2002). *Research methods in social relations* (7th ed.). Fort Worth, TX: Wadsworth

47

Horowitz, J. M., Brown, A., & Cox, K. (2019). *Race in America 2019*. Retrieved from Pew Research Center: Social and Demographic Trends website: https://www.pewsocialtrends.org/2019/04/09/race-in-america-2019/

Hunt, M. (2007). African American, Hispanic, and White beliefs about Black/White inequality, 1977-2004. *American sociological review*, 72, 390-415.

Jones, K., Arena, D., Nittrouer, C., Alonso, N., & Lindsey, A. (2017). Subtle discrimination in the workplace: A vicious cycle. *Industrial and Organizational Psychology, 10*(1), 51-76. doi:10.1017/iop.2016.91

Jones, K. P., Peddie, C. I., Gilrane, V. L., King, E. B., & Gray, A. L. (2016). Not so subtle a meta-analytic investigation of the correlates of subtle and overt discrimination. *Journal of Management*.42 (6),1588-1613 doi:10.1177%2F014920631350646

Jones, J., Schmitt, J., & Wilson, V., (February 26, 2018). *50 years after the Kerner Commission; African Americans are better off in many ways but are still disadvantaged by racial inequality*. Washington D.C.: Economic Policy Institute.

Kalev, A., Dobbin, F., & Kelly, E. (2006). Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies. *American Sociological Review, 71*(4), 589–617. https://doi.org/10.1177/000312240607100404

Krieger, N., Waterman, P.D., Hartman, C., Bates, L.M., Stoddard, A.M., Quinn, M.M., Sorensen, G., & Barbeau, M., (2006). Social hazards on the job: Workplace abuse, sexual harassment, and racial discrimination – A study   of Black, Latino and White low-income women and men workers in the   United States, *International Journal of Health Service,* 6, 51-85.

Lee, D. L., & Ahn, S. (2013). The relation of racial identity, ethnic identity, and racial socialization to discrimination–distress: A meta-analysis of Black Americans. *Journal of Counseling Psychology, 60*(1), 1–14. doi:10.1037/a0031275.

Lee, R. T., Perez, A. D., Boykin, C. M., & Mendoza-Denton, R. (2019). On the prevalence of racial discrimination in the United States. *PLoS ONE 14*(1), 1 - 16. doi: https://doi.org/10.1371/journal. pone.0210698

Lewis, T. T., Everson-Rose, S. A., Powell, L. H., Matthews, K. A., Brown, C., Karavolos, K., et al. (2006). Chronic exposure to everyday discrimination and coronary artery calcification

in African-American women: The SWAN heart study. *Psychosomatic Medicine, 68*(3), 362–368.

Light, R., Roscigno, V.J., & Kalev, A. (2011). Racial discrimination, interpretation, and legitimation at work. *Annals of the American academy of political and social science*, 634, 39-59.

McCord, M.A., Joseph, D.L., Dhanani, L.Y., & Beus, J.M. (2018). A meta-analysis of sex and race differences in perceived workplace mistreatment. *Journal of Applied Psychology*, 103(2), 137-163. http://dx.doi.org/10.1037/apl0000250

McCruden, P. (2017). Dealing with racist patient requests: Law, rights and Catholic identity. *Health care ethics USA*, Summer 2017, 21-29.

Miller, C. T., & Kaiser, C. R. (2001). A theoretical perspective on coping with stigma. *Journal of Social Issues, 57*(1). 73-92. Doi: https://doi.org/10.1111/0022-4537.00202

Miscally, M. E. (2009). A path model of discrimination, social integration, social support, and substance use for Asian American adults. Unpublished doctoral dissertation, Tulane University, New Orleans, LA.

Nadal, K. L., Griffin, K. E., Wong, Y., Hamit, S., & Rasmus, M. (2014). The impact of racial microaggressions on mental health: Counseling implications for clients of color. *Journal of Counseling & Development, 92*(1), 57–66. https://doi.org/10.1002/j.1556-6676.2014.00130.x

Noh, S., & Kaspar, V. (2003). Perceived discrimination and depression: Moderating effects of coping, acculturation, and ethnic support. *American Journal of Public Health, 93*(2), 232–238.

NPR/Robert Wood Johnson Foundation/Harvard T.H. Chan School of Public Health. (2017) "Discrimination in America: Experiences and Views of African Americans." Retrieved from https://www.npr.org/assets/img/2017/10/23/discriminationpoll-african-americans.pdf

NPR/Robert Wood Johnson Foundation/Harvard T.H. Chan School of Public Health. (2017) "Discrimination in America: Experiences and Views of White Americans." Retrieved from https://www.npr.org/documents/2017/oct/discrimination-whites-final.pdf

:NPR/Robert Wood Johnson Foundation/Harvard T.H. Chan School of Public Health. (2018) "Discrimination in America: Final Summary" Retrieved from

https://cdn1.sph.harvard.edu/wp-content/uploads/sites/94/2018/01/NPR-RWJF-HSPH-Discrimination-Final-Summary.pdf

Offerman, L.R., Basford, T.E., Graebner, R., Jaffer, S., Basu De Graaf, S., & Kaminsky, S.E. (2014). See no evil: Color blindness and perceptions of subtle racial discrimination in the workplace. *Cultural diversity and ethnic minority psychology*, 20(4), 499-507. http://dx.doi.org/10.1037/a0037237

Ong, A. D., Cerrada, C., Lee, R. A., & Williams, D. R. (2017). Stigma consciousness, racial microaggressions, and sleep disturbance among Asian Americans. *Asian American Journal of Psychology, 8*(1), 72-81. http://dx.doi.org/10.1037/aap0000062

Ozier, E.M., Jones Taylor, V., & Murphy, M.C., (September 2019) The cognitive effects of experiencing and observing subtle racial discrimination. *Journal of Social Issues. On-Line First* **https://doi.org/10.1111/josi.12349**

Paradies, Y., (2006). A systematic review of empirical research on self-reported racism and health. *International Journal of Epidemiology, 10,* 1-14.

Pascoe, E. A. & Smart Richman, L. (2009). Perceived discrimination and health: A meta-analytic review. *Psychological Bulletin, 135(4),* 531-554

Paul-Emile, K. (2012). Patients' racial preferences and the medical culture of accommodation. *UCLA law review*, 60, 462-504.

Paul-Emile, K., Smith, A.K., Lo, B., & Fernandez, A. (2016). Dealing with racist patients. *New England journal of medicine*, 374(8), 708-711.

Pearlin, L.I. (1989). The sociological study of stress. *Journal of Health and Social Behavior*, 30 (3), 241-256.

Penn State Health (May 2018). *Patient Rights Policy*. Retrieved September 27, 2019 from https://hmc.pennstatehealth.org/documents/11396232/11459793/Patient+Rights+Policy+PC-33-HAM/b4f54cb1-7183-43cb-a606-640bc66a84c8

Peters, R. M. (2006). The relationship of racism, chronic stress emotions, and blood pressure. *Journal of Nursing Scholarship, 38(3),* 234-240.

Perry, S. P., Murphy, M. C., & Dovidio, J. F. (2015). Modern prejudice: Subtle, but unconscious? The role of Bias Awareness in Whites' perceptions of personal and others' biases. *Journal of Experimental Social Psychology, 61,* 64-78.

Pew Research Center. (2016). 2016 Racial Attitudes in America Survey.: Survey Report:

Retrieved from Pew Research Center: Social and Demographic Trends website: https://www.pewsocialtrends.org/dataset/2016-racial-attitudes-in-america-survey/

Pew Research Center. (2017). Most Americans say Trump's election has led to worse race relations in the U.S.: Survey Report: Retrieved from Pew Research Center: U.S. Politics and Policy website: https://www.people-press.org/2017/12/19/most-americans-say-trumps-election-has-led-to-worse-race-relations-in-the-u-s/

Pew Research Center. (April 2019). *Race in America 2019*. Washington DC: Author.

Pieterse, A. L., Todd, N. R., Neville, H. A., & Carter, R. T. (2012). Perceived racism and mental health among Black American adults: A meta-analytic review. *Journal of Counseling Psychology, 59*(1), 1-9. doi:10.1037/a0026208

Porter, C., & Barbee, E. ( 2004). Race and racism in nursing research: Past, present and future. *Annual Review of Nursing Research*, *22*(1), 9–37

Purnell, J.Q., Peppone, L.J., Alcaraz, K., McQueen, A, Guideo, J.J., Carroll, J.K., Shacham, E., & Morrow, G.R. (2012). Perceived discrimination, psychological distress, and current smoking status: Results from the Behavioral Risk Factor Surveillance System Reactions to Race Module, 2004-2008. *American Journal of Public Health*, 102(5), 844-851.

Reynolds, K.L., Cowden, J.D., Brosco, J.P., & Lantos, J.D. (2015). When a family requests a white doctor. *Pediatrics*, 136(2), 381-386.

Rosado, C. (1998). *The Multiple features of racism*. Retrieved on September 22, 2009 from http://curry.edschool.virginia.edu/go/multicultural/papers/caleb/futures_of_racism.html

Roscigno, V. J., Williams, L. M., Byron, R. A. (2012). Workplace racial discrimination and middle-class vulnerability. *American Behavioral Scientist, 56*(5), 696-710. doi: 10.1177/0002764211433805

Rospenda, K.M., Richman, J.A., & Shannon, C.A. (2009). Prevalence and mental health correlates of harassment and discrimination in the workplace: Results from a national study. *Journal of interpersonal violence*, 24(5), 819-843.

Schapira, L., Gordon-Rowe, L., Martignetti, R., Washington, D., Bartholomay, M., Greenberg, D., Lathan, C., LaFrancesca, J., Lynch, T., & Chabner, B. (2018). Racism in the chemotherapy unit: A nurse's story. *The Oncologist*, 13, 1177-1180.

Schmitt, M. T., Branscombe, N. R., Postmes, T., & Garcia, A., (2014). The consequences of perceived discrimination for psychological well-being: A meta-analytic review. *Psychological Bulletin, 140*(4), 921–948. doi:10.1037/a0035754.

Schulz, A. J., Gravlee, C. C., Williams, D. R., Israel, B. A., Mentz, G., & Rowe, Z. (2006). Discrimination, symptoms of depression, and self-rated health among African American women in Detroit: Results from a longitudinal analysis. *American Journal of Public Health, 96*(7), 1265–1270. doi:10.2105%2FAJPH.2005.064543.

Singh, K., Sivasubramaniam, P., Ghuman, S. & Mir, H.R. (December, 2015). The dilemma of the racist patient. *The American journal of orthopedics*, E477-E479.

Smedley, B. D., Stith, A. Y., & Nelson, A. R. (Eds.). (2003). *Unequal treatment: Confronting racial and ethnic disparities in health care.* Institute of Medicine, Washington, DC: National Academic Press.

Smiley, R. A., Lauer, P., Bienemy, C., Berg, J. G., Shireman, E., Reneau, K. A., & Alexander, M. (2018). The 2017 National Nursing Workforce Survey. *Journal of Nursing Regulation, 9*(3), S1-S88.

Strakowski, S.M. (2003). How to avoid ethic bias when diagnosing schizophrenia. *Current Psychiatry Online*, 2(6).

Stangor, C., Swim, J., Van Allen, K., & Sechrist, G. (2002) Reporting discrimination in public and private contexts. *Journal of Personality and Social Psychology*, 82, 69-74.

Sternthal, M. J., Slopen, N., & Williams, D. R. 2011. Racial disparities in health: How much does stress really matter? *Du Bois Review, 8*(1), 95–113. doi:10.10170S1742058X1100008.

Substance Abuse and Mental Health Services Administration (SAMHSA). (2015). *Racial/ethnic differences in mental health service use among adults*. Washington, DC: Author.

Sutton, T. E., Gordon Simons, L., Martin, B. T., Klopack, E. T., Gibbons, F. X., Beach, S. R. H., & Simons, R. L. (2019). Racial discrimination as a risk factor for African American men's physical partner violence: A longitudinal test of mediators and moderators. *Violence Against Women.* doi: https://doi.org/10.1177/1077801219830245

Talley, C., Talley, H., & Collins-McNeil, J. (2016). The continuing quest for parity: HBCU nursing students' perspectives on nursing and nursing education. *Nurse Education Today, 43*(1), 23-27. https://doi.org/10.1016/j.nedt.2016.04.006

Taylor, S. E. (2018). *Health Psychology* (10th ed). Boston: McGraw-Hill.

Taylor, S. E. (2015). *Health Psychology* (9th ed). Boston: McGraw-Hill.

Tedeschi, B. (October 18, 2017). 6 in 10 doctors report abusive remarks from patients, and many
    get little help coping with the wounds. *STAT*. Retrieved on September 16, 2019 from
    https://www.statnews.com/2017/10/18/patient-prejudice-wounds-doctors/

Thomas, F. (2009). Experiences of Black women who persist to graduation at predominantly
    White schools of nursing (Doctoral dissertation). Retrieved from ProQuest Dissertations
    and Theses database. (UMI No. 3394752)

Thompson, C.E., & Neville, H. A. (1999). Racism, mental health, and mental health practice.
    *The Counseling Psychologist*, 27, 155-223.

Triana, M. D. C., Jayasinger, M., & Pieper, J. R. (2015). Perceived racial discrimination and its
    correlates: A meta-analyses. *Journal of Organizational Behavior, 36*, 491–513.
    doi:10.1002/job.1988.

Truitt, A. R., & Snyder, C. R. (2019). Racialized experiences of Black nursing professionals and
    certified nursing assistants in long-term care settings. *Journal of Transcultural Nursing*.
    doi: https://doi.org/10.1177/1043659619863100

U.S. Department of Health and Human Services. (USDHHS). (2001). Mental health: culture,
    race, and ethnicity: A supplement to mental health; *A report of the Surgeon General*.
    Washington, D.C.: Author.

U.S. Department of Justice (USDOJ). (2017). *2017 Hate crime statistics*. Washington, D.C.:
    Author.

U.S. Equal Employment Opportunity Commission (June 2016). *Report of the Co-Chairs of the
    EEOC select task force on the study of harassment in the workplace*. Washington, D.C.:
    Author.

Utsey, S. O., Bolden, M. A., & Brown, A. L. (2001). Visions of revolution from the spirit of
    Frantz Fanon: A psychology of liberation for counseling African Americans confronting
    societal racism and oppression. In J. G. Ponterotto, J. M. Casas, L. A. Suzuki, & C. M.
    Alexander (Eds.), *Handbook of multicultural counseling* (pp. 311-336). Thousand Oaks,
    CA, US: Sage Publications, Inc.

Utsey, S. O., Chae, M. H., Brown, C. F., & Kelly, D., (2002).  Effect of ethnic group membership on ethnic identity, race-related stress, and quality of life. *Cultural Diversity and Ethnic Minority Psychology, 8,* 366-377

Wasti, S. & Cortina, L. (2002). Coping in context: Sociocultural determinants of responses to sexual harassment. *Journal of Personality and Social Psychology*, 83, 394-405.

Watson, S. (October 18, 2017). Credentials don't shield doctors, nurses from bias. *WebMD Health News*. Retrieved on September 16, 2019 from https://www.webmd.com/a-to-z-guides/news/20171018/survey-patient-bias-toward-doctors-nurses?ecd=medscape

WebMD Health News (2017). Retrieved from on September 16, 2019 from https://img.webmd.com/dtmcms/live/webmd/consumer_assets/site_images/article_thumbnails/news/2017/10_2017/patient_prejudice/2017_patient_prejudice_professional_survey_results.pdf

Weitzer, R. & Tuch, S.A. (2002). Perceptions of racial profiling: Race, class, and personal experience. *Criminology*, 40(2), 435-456.

Whaley, A.L. (1998). Cross-cultural perspective on paranoia: A focus on the Black American experience. *Psychiatric Quarterly*, 69(4), 325-343.

Whaley, A.L. (2001). Cultural mistrust: An important psychological construct for diagnosis and treatment of African Americans. *Professional Psychology, Research, and Practice*, 32(6), 555-562.

Wheeler, R. M., Foster, J. W., & Hepburn, K. W. (2014) The experience of discrimination by US and Internationally educated nurses in hospital practice in the USA: a qualitative study. *Journal of Advanced Nursing 70*(2), 350–359. doi: 10.1111/jan.12197

Whitgob, E.E., Blankenburg, R.L. & Bogetz, A.L. (2016). The discriminatory patients and family: Strategies to address discrimination towards trainees. *Academic medicine*, 91(11), S64-S69.

Williams, D.R., & Mohammed, S.A., (2009). Discrimination and racial disparities in health: Evidence and needed research. *Journal of Behavioral Medicine, 32,* 20-47. doi: https://doi.org/10.1007/s10865-008-9185-0

Williams, D. R. & Williams-Morris, R., (2000). Racism and mental health: the African-American experience. *Ethnicity and Health, 5*, 243-268.

Williams, D. R., & Mohammed, S. A. (2013). Racism and health I: Pathways and scientific evidence. *American Behavioral Scientist*, 1–22. https://doi.org/10.1177%2F0002764213487340

Yoo, H.C., Steger, M.F., & Lee, R.M., (2010). Validation of the subtle and blatant racism scale for Asian-American college students (SABR-A). *Cultural Diversity and Ethnic Minority Psychology, 16(3)*, 323-334.

55